Sol Luis López Vives, apelante y recurrente, *v.* Policía de Puerto Rico, apelada y recurrida.

*Número:* R-85-271        *Resuelto:* 22 de enero de 1987

*Isidro Rivera Sánchez,* abogado del recurrente; *Héctor Rivera Cruz, Secretario de Justicia, Marjorie Rivera Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nuevamente nos enfrentamos al reclamo de un ciudadano por obtener información celosamente custodiada por el Estado bajo el manto de la confidencialidad. En esta ocasión un policía cuestiona una decisión de la Junta de Apelaciones del Sistema de Administración de Personal (en adelante J.A.S.A.P.), porque se le negó acceso al documento que dio lugar a su expulsión de la uniformada. Revocamos la decisión del tribunal de instancia y devolvemos el caso a J.A.S.A.P. para que le permita al recurrente acceso al documento en cuestión y continúe con los procedimientos de rigor.

I

El recurrente, Sr. Sol Luis López Vives, fue admitido a la Policía de Puerto Rico el 25 de febrero de 1983 en calidad de Guardia-Cadete. [1] Durante el período probatorio correspondiente de dos (2) años el cadete se desempeñó como agente encubierto adscrito a la División de Control del Vicio de San Juan. [2] El 11 de julio de 1984, a base de un "informe confidencial", el entonces Superintendente Jorge L. Collazo To-

---

[1] La Ley de la Policía define "Guardia-Cadete" como "todo miembro de la Fuerza que no haya cumplido el requisito de adiestramiento básico ofrecido por la Policía". Ley Núm. 26 de 22 de agosto de 1974, Art. 2(c) según enmendado, 25 L.P.R.A. sec. 1002(c).

[2] En una evaluación de su labor policíaca el peticionario obtuvo cincuenta y dos (52) puntos de un total de setenta (70). En este informe se incluyó el siguiente comentario por parte del supervisor: "Se evalúa al máximo este agente en el encasillado número siete (7) por que este (*sic*) observa buenas relaciones con sus compañeros y superiores."

rres lo *separó* del cuerpo policíaco "debido a sus hábitos, confiabilidad y actitudes".

De la referida decisión el cadete instó recurso de apelación ante J.A.S.A.P. al amparo de la Sec. 7.14 de la Ley de Personal del Servicio Público, Ley Núm. 5 de 14 de octubre de 1985 (3 L.P.R.A. sec. 1394), (3) y de la Ley de la Policía (4)

---

(3) En lo pertinente dice ésta:

*"Jurisdicción apelativa*

"Con sujeción a las excepciones que se establecerán más adelante en este Capítulo, se podrá apelar de las acciones o decisiones de la Oficina Central, de los Administradores Individuales, y de las autoridades nominadoras, en los casos y por las personas que se especifican a continuación:

"(1) En casos de destitución o suspensión de empleo y sueldo por un empleado de carrera que esté dentro del Sistema de Personal, o cuando alegue que una acción o decisión que le afecta viola cualquier derecho que se le conceda a virtud de las disposiciones de este Capítulo, del reglamento que se apruebe para instrumentar este Capítulo, o de los reglamentos adoptados por los Administradores Individuales para dar cumplimiento a este Capítulo. Las acciones que interpongan los empleados y que estén relacionadas con las áreas esenciales al principio de mérito, según señaladas en la sec. 1331 de este título, serán vistas en primera instancia por la Junta.

"(2) Por un ciudadano, cuando alegue que una acción o decisión que le afecta viola su derecho a entrar en el Sistema de Administración de Personal en cumplimiento con el principio de mérito."

(4) Ley Núm. 26 de 22 de agosto de 1974, según enmendada, Art. 8(e) (25 L.P.R.A. sec. 1008(e)). Ésta reza:

"(e) El ingreso de todo miembro de la Fuerza estará sujeto a un período probatorio de dos (2) años durante el cual la persona podrá ser separada del servicio en cualquier momento si a juicio del Superintendente demuestra ineptitud para ser miembro de la Policía, o sus hábitos y confiabilidad no ameritan que continúe en el Cuerpo. Dicho período probatorio no incluirá ningún período de ausencia del servicio activo por cualquier concepto, que exceda de treinta (30) días. El Superintendente hará una evaluación cada seis (6) meses de la labor realizada por los miembros de la Fuerza que estén en período probatorio y enviará copia de esta evaluación a las partes interesadas.

"Salvo lo anteriormente dispuesto, los miembros de la Fuerza en período probatorio tendrán iguales derechos y privilegios que los miembros regulares de la Fuerza. Los miembros de la Policía que al entrar en vigor esta ley no hayan cumplido dos años de servicio consecutivos en la Fuerza deberán completar el resto del período probatorio de dos años que por este Capítulo se dispone."

así como su Reglamento de Personal. (⁵) Mediante resolución J.A.S.A.P. confirmó la actuación del Superintendente. Al tomar su determinación J.A.S.A.P. tuvo ante sí el "informe confidencial" preparado por la Policía, pero le denegó al señor López ,acceso a la comunicación porque su "confidencialidad estaba ampliamente justificada".

El señor López Vives presentó ante el Tribunal Superior, Sala de Guayama, una solicitud para revisar la determinación de J.A.S.A.P. Alegó básicamente que ésta erró al tomar su decisión a base de un informe confidencial sin dar al recurrente la oportunidad de conocer la identidad de la persona que practicó la investigación y el contenido del escrito para poder refutarlo. El tribunal de instancia dictó una orden requiriéndole a la parte recurrida que radicara en sobre sellado las evaluaciones que sirvieron de base para la separación del recurrente. Civil Núm. CS-85-408, Orden de 10 de abril de 1985. El 10 de mayo de 1985 el tribunal a quo dictó sentencia confirmando a J.A.S.A.P. y le negó al señor López acceso a la comunicación.

De esta determinación el señor López Vives recurrió ante nos para reclamar que la decisión de J.A.S.A.P. que le denegó acceso al informe le impide ejercer los derechos garantizados por la Ley de Personal y la Ley de la Policía, y que viola su derecho al debido proceso de ley. En vista de que el recurso

---

(⁵) Éste dispone:

"Cualquier empleado que fracase en su período de trabajo probatorio podrá solicitar revisión ante la Junta de Apelaciones en aquellos casos donde se alegue discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social o por ideas políticas o religiosas como motivo de su separación. Se requerirá que de la faz del escrito de apelación aparezca[n] claramente los hechos específicos en que basen sus alegaciones." Reglamento de Personal de la Policía de Puerto Rico, Art. 12, Sec. 12.11(12).

Esta sección del Reglamento de la Policía limita la jurisdicción de J.A.S.A.P. a "aquellos casos donde se alegue discrimen por razones de raza, color," etc. Sin embargo, la Sec. 7.14 de la Ley de Personal anteriormente citada no limita la jurisdicción de J.A.S.A.P. Conocida es la norma que postula que ningún reglamento puede limitarle a los ciudadanos los derechos que la ley le confiere.

plantea una cuestión novel e importante para el interés público, el 3 de julio de 1985 expedimos el auto.

## II

Inspirada en la Declaración Universal de los Derechos del Hombre, la Constitución del Estado Libre Asociado de Puerto Rico tiene un origen y un historial distinto a la Constitución de Estados Unidos de América. El ánimo reformista de "la generación del cuarenta" y la vocación liberal de los miembros de la Constituyente, caracterizaron los criterios de selección de las libertades consignadas y exigibles. Sus partes expositivas constituyen también una declaración de aspiraciones y propósitos individuales y colectivos. Con la profusa experiencia constitucional de Estados Unidos hemos construido las protecciones mínimas de los derechos fundamentales. Sin embargo, con nuestra Carta de Derechos podemos ir más lejos en la defensa de los derechos humanos. Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1980, Vol. III, págs. 169–170. (⁶) Nuestra

---

(⁶) En Puerto Rico desde hace varios años le hemos conferido a nuestra Carta de Derechos un alcance mayor al interpretado por el Tribunal Supremo federal a la Carta de Derechos de la Constitución norteamericana. Véanse *e.g.: Pueblo* v. *Rovira Ramos,* 116 D.P.R. 945, 955 (1986) (Rebollo, J., concurrente); *E.L.A.* v. *Coca Cola Bott. Co.,* 115 D.P.R. 197, 205 (1984); *Soto* v. *Srio. de Justicia,* 112 D.P.R. 477 (1982); *Figueroa Ferrer* v. *E.L.A.,* 107 D.P.R. 250, 258–263 (1978); *Pueblo* v. *Dolce,* 105 D.P.R. 422, 428 (1976); *Pagán Hernández* v. *Alcaide,* 102 D.P.R. 101, 113 (1974); *Rivera Escuté* v. *Jefe Penitenciaría,* 92 D.P.R. 765 (1965); *Reyes* v. *Tribunal Superior,* 84 D.P.R. 29 (1961); *Soto Ramos* v. *Supert. Granja Penal,* 90 D.P.R. 731, 734 (1964).

En los últimos años los Tribunales Supremos de muchos estados han interpretado las disposiciones de la Carta de Derechos de sus respectivas constituciones reconociéndoles a los ciudadanos mayores derechos y libertades que las otorgadas por el Tribunal Supremo federal. Véanse *e.g.: Robins* v. *Pruneyard Shopping Center,* 592 P.2d 341 (1979), confirmado 447 U.S. 74 (1980); *State* v. *Jackson,* 688 P.2d 136 (Wash. 1984). Véanse, entre otros, L. Sager, *Foreword: State Courts and the Strategic Space Between the Norms and Rules of Constitucional Law,* 63 Tex. L. Rev. 959 (1985); S. Pollock, *Adequate and Independent State Grounds as a Means of Balancing*

Constitución reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos. Al interpretar sus contornos, debemos garantizar su vigorosidad y relevancia a los problemas socioeconómicos y políticos de nuestro tiempo. Con este marco conceptual nos ha correspondido la delicada tarea de establecer el balance entre los intereses del ciudadano en tener acceso a los documentos públicos y los del Estado de evitar divulgación a destiempo que perjudique investigación de importancia o revele secretos de estado.

La clara tendencia a favor de la divulgación de información pública expresada por este Tribunal en *Sierra* v. *Tribunal Superior*, 81 D.P.R. 554 (1959), y seguida en *Dávila* v. *Superintendente de Elecciones*, 82 D.P.R. 264 (1960), culminó con nuestros pronunciamientos en *Soto* v. *Srio. de Justicia*, 112 D.P.R. 477, 485 (1982), que impartieron una dimensión amplia y robusta a la ·libertad de expresión consagrada en nuestra Carta de Derechos.

El ideal de una verdadera democracia como desiderátum en que se inspira nuestra Constitución concibe la libertad de palabra, de prensa, de reunión pacífica y de pedir al gobierno la reparación de agravios "dentro de la más dilatada"

*the Relationship Between State and Federal Courts*, 63 Tex. L. Rev. 977 (1985); S. Mosk, *State Constitutionalism: Both Liberal and Conservative*, 63 Tex. L. Rev. 1081 (1985); S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex. L. Rev. 1141 (1985); Nota, *Unenumerated Rights Clauses in State Constitutions*, 63 Tex. L. Rev. 1321 (1985); H. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165 (1984); Project Report, *Toward an Activist Role for State Bills of Rights*, 8 Harv. C.R.-C.L. L. Rev. 271 (1973). Los Jueces Asociados del Tribunal Supremo de Estados Unidos, Brennan y Stevens, han manifestado su adhesión a esta corriente doctrinaria. *Massachusetts* v. *Upton*, 466 U.S. 727, 735 (1984) (Stevens, J., concurrente); *South Dakota* v. *Neville*, 459 U.S. 553, 566 (1983) (Stevens, J., disidente); *Michigan* v. *Mosley*, 423 U.S. 96, 111 (1975) (Brennan, J., disidente); W. Brennan, *Some Judicial Aspects of Federalism*, 52 Rev. Jur. U.P.R. 1, 9–10 (1983); W. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977).

visión. Por ello la Carta de Derechos expresamente consigna que "[n]o se aprobará ley alguna que restrinja" tales libertades. Art. II, Sec. 4. *Es lógico, pues, concluir que existe una estrecha correspondencia entre el derecho a la libre expresión y la libertad de información.* La premisa es sencilla. Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años. (Énfasis suplido y escolio omitido.)

Reconocimos que un ciudadano de una sociedad que se gobierna a sí misma posee el derecho constitucional de examinar la información que está en poder del Estado. Este derecho es un corolario necesario del derecho a la libre expresión consagrado en el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado. (7) El derecho de la ciudadanía a obtener información en poder del Estado no es absoluto, *Soto* v. *Srio. de*

---

(7) El Tribunal Supremo federal no ha resuelto si existe un derecho constitucional a obtener acceso a informes gubernamentales. Desde la década de los '50 los comentaristas y estudiosos de esta materia comenzaron a elaborar teorías para darle rango constitucional al derecho a la información. F. Bonilla, *El privilegio sobre información oficial y el derecho a la información,* 55 Rev. Jur. U.P.R. 97, 113 esc. 71 y fuentes allí citadas (1986). En Puerto Rico, antes de *Soto* v. *Srio. de Justicia,* supra, véase E. Rivera Ramos, *La Libertad de información: Necesidad de su reglamentación en Puerto Rico,* 44 Rev. Jur. U.P.R. 67 (1975). Sin embargo, la existencia de una ley federal especial, el *Freedom of Information Act* (F.O.I.A.), 5 U.S.C. sec. 552, ha reducido la litigación *constitucional* sobre esta materia en esa jurisdicción. Los únicos pronunciamientos del Tribunal Supremo federal sobre el derecho *constitucional* a la información, *Richmond Newspapers, Inc.* v. *Virginia,* 448 U.S. 555 (1980); *Globe Newspaper Co.* v. *Superior Court,* 457 U.S. 596 (1982), no gozan de la amplitud y vigor de nuestro pronunciamiento en *Soto* v. *Srio. de Justicia,* supra. No obstante, la política pública de la F.O.I.A. a favor de la divulgación, *NLRB* v. *Robbins Tire & Rubber Co.,* 437 U.S. 214, 220 (1978); *EPA* v. *Mink,* 410 U.S. 73, 79–80 (1973); *Dept. of Air Force* v. *Rose,* 425 U.S. 352, 361 (1976); S. Stone & R. Liebman, *Testimonial Privileges,* Colorado Springs, McGraw-Hill Book Co., 1983, Sec. 9.03, pág. 501, similar a los principios esbozados en *Dávila* v. *Superintendente de Elecciones,* 82 D.P.R. 264 (1960), y *Soto* v. *Srio. de Justicia,* supra, permiten que en ocasiones utilicemos la jurisprudencia federal sobre dicha ley como *fuente ilustrativa.*

*Justicia,* supra, pág. 493. Este derecho puede ser limitado por el Estado si existe un interés apremiante que lo justifique.

█ Recientemente en *Santiago* v. *Bobb y El Mundo, Inc.,* 117 D.P.R. 153, 159 (1986), reconocimos que en un procedimiento judicial un reclamo de confidencialidad del Gobierno debe resolverse conforme con la Regla 31 de Evidencia. Allí afirmamos que el Gobierno puede reclamar, con posibilidad de éxito, la secretividad de cierta información sólo en un limitado número de supuestos; "cuando: (1) una ley así lo declara; (2) la comunicación está protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos; . . . (3) revelar la información pueda lesionar derechos fundamentales de terceros; . . . (4) se trate de la identidad de un confidente —Regla 32 de Evidencia— y (5) sea información oficial conforme la Regla 31 de Evidencia". (Citas omitidas.)

█ En esta ocasión nos enfrentamos a otra dimensión del problema: el derecho que tiene un ciudadano ante un tribunal administrativo a nivel apelativo a examinar en una etapa significativa del procedimiento un informe sobre su persona que fue el fundamento principal para una decisión en su contra. En particular se cuestiona la decisión de J.A.S.A.P. de negarle a un empleado el acceso a un informe sobre sus actuaciones que motivó su destitución.

█ A J.A.S.A.P., al igual que a otros tribunales administrativos a nivel apelativo, le han sido delegados poderes de adjudicación. *Díaz Marín* v. *Mun. de San Juan,* 117 D.P.R. 334 (1986). Su función consiste en decidir una controversia fáctica entre personas, aplicando a los hechos específicos del caso las normas y el derecho vigente. *López* v. *Junta Planificación,* 80 D.P.R. 646 (1958). "Parte esencial de reformas a los sistemas de justicia en muchas jurisdicciones . . . es el reconocimiento de que organismos no judiciales deben atender asuntos que hasta cierto tiempo se consideraron de la compe-

tencia exclusiva de los tribunales." *Hernández Denton* v. *Quiñones Disdier*, 102 D.P.R. 218, 223 (1974).

■ La comparecencia ante J.A.S.A.P. es la última oportunidad que tiene el peticionario en el procedimiento administrativo para confrontar la prueba y defenderse. En este sentido es equivalente a un juicio en sus méritos, pues no es una etapa preliminar del caso. Una vez J.A.S.A.P. emite su dictamen el único remedio disponible es un recurso de revisión en donde el alcance de la intervención judicial es limitado.

■ Desde la creación a principios de siglo de estas agencias administrativas, los tribunales han aceptado que para desempeñar adecuadamente las múltiples funciones asignadas en esta sociedad al Estado era necesario otorgar poderes de adjudicación. La preocupación inicial de los tribunales con la constitucionalidad de la delegación de múltiples poderes a estas entidades fue superada en la década del cuarenta y ahora la revisión judicial mayormente se ha convertido en un instrumento para evitar actuaciones arbitrarias y velar por el cumplimiento estricto con el debido proceso. *Hernández Denton* v. *Quiñones Disdier*, supra, pág. 224.

■ Por la naturaleza de los poderes delegados, requerimos que los tribunales administrativos a nivel apelativo adopten procedimientos que le permitan al apelante una oportunidad de ser oído para defenderse y presentar su caso en un proceso con las garantías adecuadas. *Vélez Ramírez* v. *Romero Barceló*, 112 D.P.R. 716 (1982); *Rodríguez* v. *Tribunal Superior*, 104 D.P.R. 335 (1975); *Domínguez Talavera* v. *Tribunal Superior*, 102 D.P.R. 423 (1974); *López* v. *Junta Planificación*, supra; *Mathews* v. *Eldridge*, 424 U.S. 319 (1976); *Goss* v. *López*, 419 U.S. 565 (1975); S. Breyer y R. Stewart, *Administrative Law and Regulatory Policy*, 2da ed., Boston, Little, Brown & Co., 1985, Cap. 7, págs. 699 *et seq*. El debido proceso no es un "molde rígido que prive de flexibilidad" a los

organismos administrativos, *Rodríguez* v. *Tribunal Superior*, supra, pág. 340, pero requiere un proceso justo y equitativo que respete la dignidad de los individuos afectados. L. Tribe, *American Constitutional Law*, Nueva York, The Foundation Press, 1978, pág. 503; B. Schwartz, *Administrative Law*, 2da ed., Boston, Little, Brown & Co., 1984, Cap. 5, págs. 201–270.

Entre estas garantías, una parte afectada tiene derecho a presentar toda la prueba necesaria para sostener su reclamo, así como refutar oralmente o por escrito la evidencia sometida en su contra. Para facilitar la presentación de prueba en los procedimientos administrativos, los tribunales no han requerido la aplicación de las Reglas de Evidencia. Regla 1 de Evidencia. Véanse: Comentario Oficial a Regla 1 de Evidencia; E. L. Chiesa, *Práctica Procesal Puertorriqueña*, San Juan, Pubs. J.T.S., 1983, Evidencia—Vol. 1, pág. 2. La razón de ser de la norma que postula la no aplicación de las reglas procesales y de evidencia de los tribunales a los procedimientos administrativos es para evitar "las trabas procesales de los tribunales de justicia". *Martínez* v. *Tribunal Superior*, 83 D.P.R. 717, 720 (1961). Véase *J.R.T.* v. *Missy Mfg. Corp.*, 99 D.P.R. 805 (1971). El proceso administrativo debe ser ágil y sencillo, que propicie su uso eficiente por parte de las personas *legas.*

No obstante, en ocasiones el Estado tiene razones válidas para negarle a un ciudadano información. Por la naturaleza de los procedimientos en los tribunales administrativos a nivel apelativo, el Estado está facultado para levantar los privilegios de confidencialidad recogidos en las Reglas 31 y 32 de Evidencia. (8) Los principios que aconsejan que las

---

(8) Regla 31—*Privilegio sobre información oficial*

(A) Según usada en esta regla, "información oficial" significa información adquirida en confidencia por un funcionario o empleado público en el desempeño de su deber y que no ha sido oficialmente revelada ni está accesible al público hasta el momento en que se invoca el privilegio.

Reglas de Evidencia no se apliquen en procedimientos administrativos en nada se afectan si le permitimos al Estado invocar estos privilegios. Todo lo contrario. Su aplicación provee un mecanismo que le permite al juzgador establecer el balance entre el interés del ciudadano de obtener la información y el del Estado de no divulgarla prematuramente. Finalmente, sería ilógico resolver que lo que el Estado está facultado a no revelar en un proceso judicial tenga que ser divulgado en un proceso ante un tribunal administrativo. "Cualquier privilegio basado en política pública sustancial es obviamente tan apropiado para procedimientos administrativos como judiciales." (Traducción nuestra.) K. Davis, *Administrative Law Treatise*, 2da ed., San Diego, Davis Pub. Co., 1980, Vol. 3, Sec. 16.10, pág. 263. Véanse: *McCormick, Evidence*, Cap. 37, Sec. 356 (3ra ed. 1984); E. Gellhorn, *The Treatment of Confidential Information by the Federal Trade Commission: The Hearing*, 116 U. Pa. L. Rev. 401, 423–427, (1968); E. Gellhorn, *The Treatment of Confidential Information by the Federal Trade Commission: Pretrial Practices*, 36 U. Chi. L. Rev. 113, 157–177 (1968).

---

(B) Un testigo tiene el privilegio de no divulgar una materia por razón de que constituye información oficial, y no se admitirá evidencia sobre la misma si el tribunal concluye que la materia es información oficial y su divulgación está prohibida por ley, o que divulgar la información en la acción sería perjudicial a los intereses del gobierno del cual el testigo es funcionario o empleado.

Regla 32—*Privilegio en cuanto a identidad de informante*

Una entidad pública tiene el privilegio de no revelar la identidad de una persona que ha suministrado información tendente a descubrir la violación de una ley del Estado Libre Asociado de Puerto Rico o de los Estados Unidos de América, si la información es dada en confidencia por el informante a un funcionario del orden público, a un representante de la agencia encargada de la administración o ejecución de la ley que se alega fue violada o a cualquier persona con el propósito de que la transmitiera a tal funcionario o representante. Evidencia sobre dicha identidad no será admisible a menos que el tribunal determine que la identidad de la persona que dio la información ya ha sido divulgada en alguna otra forma, o que la información sobre identidad es esencial para una justa decisión de la controversia, particularmente cuando es esencial a la defensa del acusado.

## III

En el caso de autos el reclamo de confidencialidad por parte del Estado podría emanar de dos fuentes: que se trate de información oficial, Regla 31, o que se revelaría la identidad de confidentes o informantes, Regla 32 de Evidencia.(⁹) Debemos enfrentarnos por lo tanto al problema de si la información en este caso fue "adquirida en confidencia por un funcionario o empleado público en el desempeño de su deber", Regla 31, para luego someterla a un estricto balance de intereses.(¹⁰)

Esta determinación se hace mediante un análisis integral de todas las circunstancias que rodean la comunicación.(¹¹) *Santiago* v. *Bobb y El Mundo, Inc.,* supra. Con estos

---

(⁹) Alega la recurrida, y así lo entendió J.A.S.A.P. y el tribunal a quo, que la confidencialidad del informe en cuestión es necesaria e indispensable para asegurar que la Policía de Puerto Rico pueda seleccionar a las personas más aptas para ingresar al Cuerpo. Apoya su interpretación en lo resuelto por este Tribunal en *Texidor* v. *Policía de Puerto Rico,* 114 D.P.R. 363 (1983). En *Texidor* v. *Policía de Puerto Rico,* supra, resolvimos que los tribunales en su función revisora tienen que evaluar todos los elementos, incluyendo los "informes confidenciales" de la Policía considerados por la agencia administrativa en su proceso decisional. Sin embargo, en el caso de autos el tribunal de instancia examinó el escrito confidencial de la Policía y dictó sentencia confirmando la decisión de J.A.S.A.P.

(¹⁰) Al enfrentarnos a un reclamo de confidencialidad por parte del Estado, "el balance de intereses requerido por la Regla 31(b) debe realizarse de forma estricta a favor del reclamante de la solicitud y en contra del privilegio reconocido en dicha regla. Para que el Estado prevalezca, éste debe presentar prueba y demostrar la existencia de intereses apremiantes de mayor jerarquía que los valores protegidos por este derecho de libertad de información de los ciudadanos". Bonilla, *op. cit.,* citado en *Santiago* v. *Bobb y El Mundo, Inc.,* 117 D.P.R. 153, 162 esc. 4 (1986). *Cf.* K. Davis, *Administrative Law Treatise,* 2da ed., San Diego, Davis Pub. Co., 1980, Vol. 3, Sec. 16.10, pág. 263.

(¹¹) Además de los valores de libertad de expresión que hay que garantizar en el balance de intereses a realizarse luego de determinar que la información se obtuvo en confidencia, las propias reglas exigen ese balance estricto. Reglas 31, 32 y 35 de Evidencia.

propósitos el tribunal administrativo deberá examinar la propia naturaleza y contenido del documento, y el efecto de la divulgación sobre los intereses del Estado. También debe examinar cuál es la práctica de la agencia al recibir la información, quién tiene acceso a ellos y qué usos generalmente tienen estos documentos. Finalmente, hay que considerar las consecuencias de la divulgación sobre la vida privada y la seguridad de terceros. La determinación de confidencialidad deberá ser confrontada con el interés público en la divulgación. Corresponde inicialmente a los tribunales administrativos adoptar las medidas pertinentes para facilitar el acceso a los documentos tomando en consideración en cada caso los intereses públicos y privados. Por la importancia de los derechos envueltos, los tribunales tienen una obligación especial de ser particularmente cuidadosos en revisar estas determinaciones de los tribunales administrativos para proteger a los ciudadanos de decisiones arbitrarias y caprichosas que menoscaban el derecho constitucional al acceso a la información. ([12])

■ Por otro lado, están protegidos por la Regla 32 los nombres de los confidentes que participan en la investigación concluida. Esta regla protege el nombre del confidente, pero no la información por éste ofrecida. Ésta hay que divulgarla salvo que a través de la misma se identifique la fuente. *Cf.* 8 *Wigmore, Evidence* Sec. 2374, pág. 765 (1961) ; 3 *Jones, Evidence* Sec. 21:39, págs. 842–846 (1972). Sin embargo, en caso de que la parte afectada conozca quién es el confidente,

---

([12]) *Cf. McCormick, Evidence,* Cap. 12, Sec. 110 (3ra ed. 1984) ; 8 *Wigmore, Evidence* Sec. 2379, pág. 808 (1961).

En *Soto* v. *Srio. de Justicia,* supra, pág. 504, dijimos que:

"Ante la hermética resistencia del Estado a viabilizar el derecho de acceso a información, corresponde a los tribunales franquear el camino tomando en consideración, por supuesto, los intereses públicos y privados envueltos en la situación, y adoptando todas las medidas necesarias para conseguir los fines legítimos que perseguía la legislación invocada por el Estado."

no se justifica proteger su identidad. *Cf. Wigmore, op. cit.,* pág. 766.

## IV

El tribunal a quo acogió el planteamiento de confidencialidad sin claramente esbozar las razones y sin cumplir con los requisitos de la Regla 31, *Santiago* v. *Bobb y El Mundo, Inc.,* supra, o de la Regla 32 de Evidencia. De su sentencia no se desprende por qué el recurrente no puede tener acceso al informe en una etapa significativa del procedimiento, como lo es la vista apelativa celebrada por J.A.S.A.P. Con toda probabilidad tanto J.A.S.A.P. como el tribunal de instancia se convencieron de que el contenido del informe aducía razones válidas para la separación. Sin embargo, ese no es el criterio a utilizarse. Independientemente de si la prueba era o no sólida, el recurrente tiene derecho a conocerla para poder dar su versión salvo que el Estado cumpla con los criterios de confidencialidad descritos anteriormente.

El tribunal a quo debió explorar otras alternativas para darle al cadete acceso limitado al informe. Como en este caso el reclamo de información, a diferencia de *Soto* v. *Srio. de Justicia,* supra, se limita a conocer el contenido del informe para poder refutarlo en un proceso administrativo y no para publicarlo, el tribunal puede darle acceso en cámara al informe sujeto a una orden protectora (¹³) de que no divulgue su contenido so pena de desacato. *Rodríguez* v. *Scotiabank de P.R.,* 113 D.P.R. 210 (1982); *Seattle Times Co.* v. *Rhinehart,* 467 U.S. 20 (1984); *In re San Juan Star Co.,* 662 F.2d 108 (1981). Véase Nota, *Rule 26(c) Protective Orders and the First Amendment,* 80 Colum. L. Rev. 1643 (1980).

De ordinario procedería devolver el caso al tribunal sentenciador para que éste continúe con los procedimientos a

---

(¹³) Regla 23.2 de Procedimiento Civil.

tono con lo aquí expresado. Sin embargo, en los autos originales del presente recurso se incluyó el "informe confidencial" en controversia. Por tal razón, procede que analicemos sin más dilación si el mismo amerita la categoría de confidencial.

El informe se basa en una investigación sobre un incidente ocurrido el 5 de marzo de 1984 en el cual el recurrente perdió su arma de reglamento.([14]) Las personas interrogadas durante la investigación fueron los supervisores del recurrente y sus compañeros de labores. Los testimonios de éstos no se basaron en una investigación secreta o confidencial. Por el contrario, sus testimonios versaron sobre su apreciación de los *hechos* el día que se desapareció el arma. Aunque la mayoría de los interrogados eran agentes encubiertos, éstos eran compañeros de trabajo del recurrido. Por lo tanto, no existe razón para ocultarle su identidad al cadete. *Wigmore, op. cit.*, pág. 766.

No estamos aquí frente a una investigación sobre corrupción en la cual la agencia administrativa o la Policía "infiltra" un agente o confidente dentro del grupo de empleados para que éste obtenga información sobre actividades deshonestas o delictivas. Las preguntas que se le hicieran a los testigos versaban sobre su apreciación de los *hechos* el día que el recurrido supuestamente perdió el arma de reglamento, por ejemplo, a qué hora salieron del Cuartel, si tenía el arma de reglamento consigo, etc. Estamos ante un informe puramente de hechos. *Cf. EPA* v. *Mink*, 410 U.S. 73 (1973); *Brinton* v.

---

([14]) Ni la carta de separación del Superintendente, ni la resolución de J.A.S.A.P., ni la sentencia del tribunal de instancia mencionaron el incidente de desaparición del arma de reglamento. Este incidente ocurrió el 5 de marzo de 1984. El informe es de fecha de 4 de mayo de 1984. No obstante, la separación del cargo no ocurrió hasta el 11 de julio de 1984, dos (2) meses después. Cuando por primera vez se informa que la razón para el despido fue la pérdida del arma de reglamento es en el escrito del Procurador General. Resulta sorprendente que información que se le denegó al recurrente —la causa de la separación— nos haya sido informada a nosotros a través del alegato del recurrido, que es un documento público.

*Department of State*, 636 F.2d 600, 605 (1980), *cert.* denegado 452 U.S. 905 (1981); *Orion Research Inc.* v. *E.P.A.*, 615 F.2d 551, 554 (1980), *cert.* denegado 447 U.S. 833 (1980); *Montrose Chemical Corporation of California* v. *Train*, 491 F.2d 63, 66 (1974); *Ethyl Corporation* v. *Environmental Protection Agency*, 478 F.2d 47, 49 (1973).

Por otro lado, no hay ninguna evidencia de que la investigación practicada tenga como fin descubrir la violación de alguna ley criminal o civil. El hecho de que haya sido preparada por la propia Policía de por sí no le convierte en el "récord investigativo" que esta excepción a la norma sobre divulgación pretende cobijar. *Soto* v. *Srio. de Justicia*, supra, págs. 495–496; M. Larkin, *Federal Testimonial Privileges*, New York, Clark Boardman, 1982, Sec. 5.02[3], pág. 5–32. La investigación objeto del informe se encaminaba a determinar si el recurrente estaba capacitado para ser policía como consecuencia de un alegado incidente en el que se vio involucrado. Al momento de solicitar acceso al informe ya se había tomado la decisión de separarlo del Cuerpo. Darle acceso al informe no frustraría la investigación porque ésta ya había terminado y sus recomendaciones se habían puesto en vigor. *McCormick*, *op. cit.*, Sec. 108. Otro quizás sería el resultado si la investigación o el proceso deliberativo no hubiese concluido y sus recomendaciones todavía no se hubiesen puesto en vigor, Larkin, *op. cit.*, Sec. 5.02[2], pág. 5–16. *Cf. NLRB* v. *Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978); S. Stone y R. Liebman, *Testimonial Privileges*, Colorado Springs, McGraw-Hill Book Co., 1983, Sec. 9.14, pág. 526; o si otros intereses del Estado estuvieren involucrados, como lo sería la seguridad pública o los derechos constitucionales de otros ciudadanos.

Un análisis ponderado del documento y de los intereses aquí en controversia nos obliga a concluir que en el presente caso no hay ninguna razón por la cual al recurrente, en compañía de su abogado, se le impida examinar en cámara el contenido del informe en controversia.

Por las razones expuestas anteriormente, *se revoca la sentencia recurrida y se devuelve el caso a J.A.S.A.P. para que ésta, luego de permitirle al recurrente examinar el escrito, continúe con los procedimientos establecidos por ley.*

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión escrita. La Juez Asociada Señora Naveira de Rodón emitió opinión concurrente.

—O—

Opinión concurrente de la Juez Asociada Señora Naveira de Rodón.

I

Concurrimos con el resultado de la opinión del Tribunal en cuanto dispone revocar "la sentencia recurrida y [devolver] el caso a J.A.S.A.P. para que ésta, luego de permitirle al recurrente examinar el escrito, continúe con los procedimientos establecidos por ley". Entendemos que ese resultado lo fundamenta el derecho a la intimidad del recurrente López Vives, en lugar del fundamento del derecho de acceso a la información según *Soto v. Srio. de Justicia,* 112 D.P.R. 477 (1982), utilizado por la mayoría. [1]

La opinión del Tribunal correctamente expone la controversia en este caso de la siguiente forma:

En esta ocasión nos enfrentamos a otra dimensión del problema [de acceso a información bajo custodia del Go-

---

[1] Estamos conformes plenamente con las expresiones del Tribunal sobre la protección a los derechos humanos y el ámbito de aplicabilidad de nuestra Constitución. *Ante,* pág. 426–427.

Precisamente en esta área de litigación donde se cuestiona la invasión a la intimidad, se entiende que el esquema constitucional federal le brinda mayor campo de acción a los Estados. L. Tribe, *American Constitutional Law,* New York, The Foundation Press, 1978, pág. 969.

bierno] : el derecho que tiene un ciudadano en un procedimiento ante un tribunal administrativo a nivel apelativo a examinar en una etapa significativa del procedimiento *un informe sobre su persona* que fue el fundamento principal para una decisión en su contra. En particular se cuestiona la decisión de J.A.S.A.P. de negarle a un empleado un informe que motivó su destitución. (Énfasis nuestro.) *Ante,* pág. 229.

Certeramente se señala que se trata de una controversia nueva en el derecho de los ciudadanos a tener acceso a información en poder del Gobierno, pues se trata de información sobre la persona que la reclama. Las ocasiones en que este Tribunal ha elaborado sobre el derecho constitucional de acceso a la información, fundamentó el mismo en el derecho de libertad de expresión, *Soto* v. *Srio. de Justicia,* supra, y *Santiago* v. *Bobb y El Mundo, Inc.,* 117 D.P.R. 153 (1986). Los intereses protegidos en esas ocasiones eran distintos a los que debemos proteger en esta ocasión. Aún no nos habíamos enfrentado al reclamo de un ciudadano por la información sobre su persona recopilada por el Gobierno. Por ello entendemos, según desarrollaremos adelante, que es el derecho a la intimidad del recurrente López Vives lo que apoya el acceso a esa información.

En *Soto* v. *Srio. de Justicia,* supra, reconocimos la dimensión constitucional del derecho de acceso a la información como uno basado en el principio democrático de autogobierno. Refrendamos las expresiones del ex Juez Asociado Serrano Geyls en *Dávila* v. *Superintendente de Elecciones,* 82 D.P.R. 264, 281 (1960), de que " '[l]os ciudadanos de una sociedad que se gobierna a sí misma deben poseer el derecho *legal* de examinar e investigar cómo se conducen sus asuntos' ". (Énfasis en el original.) También véanse: *Santiago* v. *Bobb y El Mundo, Inc.,* supra, pág. 159; *Richmond Newspapers, Inc.* v. *Virginia,* 448 U.S. 555, 586–588 (1980) (Brennan, J., concurrente), citada *in extenso* en *Soto* v. *Srio. de Justicia,* supra, págs. 491–492; *Globe Newspaper Co.* v. *Superior Court,* 457

240

U.S. 596, 604 (1982). (²) " 'Es preciso que el público, como soberano, tenga toda la información disponible a fin de dar instrucciones a sus servidores, el gobierno. Como postulado general, para que la democracia funcione no se puede ocultar información'." Emmerson, *The First Amendment and the Right to Know*, 1976 Wash. U.L.Q. 1, 14 (1976), citado en *Soto* v. *Srio. de Justicia*, supra, pág. 493.

Aunque reconocemos que en este caso existen intereses de libertad de expresión, según lo expuesto en *Soto* v. *Srio. de Justicia*, supra, predominan, no obstante, los intereses de intimidad en la información. (³) Por ello, entendemos es más correcto acudir a la protección de la Sec. 8 de la Carta de Derechos de nuestra Constitución para fundamentar el derecho de acceso que tiene el recurrente López Vives a un informe "confidencial" sobre su persona en poder de la Policía de Puerto Rico. (⁴)

---

(²) En la jurisdicción federal luego de *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596 (1982), véase *Press-Enterprise Co.* v. *Superior Court of Cal.*, 464 U.S. 501 (1984); *Press-Enterprise Co.* v. *Superior Court of Cal.*, 54 L.W. 4869 (1986).

(³) La opinión del Tribunal fundamenta en parte su decisión en la garantía constitucional de debido proceso de ley; al así hacerlo le reconoce implícitamente intereses de libertad o de propiedad al demandado. Entendemos que por el fundamento de derecho a la intimidad, Sec. 8, Art. II de nuestra Constitución podemos disponer del caso sin necesidad de entrar en ese planteamiento.

(⁴) El Reglamento de Personal de la Policía de Puerto Rico de 3 de julio de 1981 dispone en el Art. 21 lo relacionado con el expediente de los empleados a quienes se les ha extendido cualquier tipo de nombramiento. Esta disposición beneficia a los cadetes de la Policía al igual que a los demás empleados de dicho Cuerpo. Véase la definición de Guardia-Cadete en el Art. 4(12) de dicho reglamento. Como norma general el citado Art. 21 le confiere a los empleados de la Policía acceso a su expediente personal. Sin embargo, el mismo no dispone criterios para determinar cuándo un empleado tiene acceso al informe que es resultado de una investigación confidencial y que se ha hecho formar parte de su expediente. El mismo problema existiría de aplicar la Ley de Personal del Servicio Público, Ley Núm. 5 de 14 de octubre de 1975, Sec. 5.8(4), 3 L.P.R.A. sec. 1348(4), la cual confiere al empleado acceso a su expediente personal. Por lo ilustrativo que es el Art. 21 en cuanto a la reglamentación del expediente personal y el acceso de los empleados al mismo, lo hemos incluido como Apéndice de esta opinión.

## II

*Derecho a la intimidad*

Nuestra Constitución dispone que: "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Vol. 1, ed. 1982, pág. 292. En *Arroyo* v. *Rattan Specialties, Inc.*, 117 D.P.R. 35, 59 (1986), expresamos que este derecho ha sido "objeto de amplia discusión en nuestra jurisprudencia. En *P.R. Tel. Co.* v. *Martínez*, 114 D.P.R. 328 (1983), reconocimos la supremacía de este derecho como uno de los derechos de la personalidad, de índole innato y privado, inherente al hombre". También véanse: *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 439–440 (1975); *García Santiago* v. *Acosta*, 104 D.P.R. 321, 324 (1975); *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20, 23 (1974).

A pesar de esa elocuente y constante jurisprudencia este Tribunal —al igual que en muchas otras jurisdicciones— no ha elaborado los contornos mínimos de este derecho. Las expresiones más claras sobre el ámbito de esta garantía constitucional se señalaron en *Whalen* v. *Roe*, 429 U.S. 589, 598–600 (1977), de la siguiente forma:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is *the individual interest in avoiding disclosure of personal matters,* and another is the interest in independence in making certain kinds of important decisions. (Escolios omitidos y énfasis nuestro.)

Esas expresiones sintetizan, en términos generales, la doctrina moderna del derecho a la intimidad. *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 455–465 (1977); *Tavoulareas* v. *Washington Post Co.*, 724 F.2d 1010, 1019 (1984); *Barry* v. *City of New York*, 712 F.2d 1554, 1558 (1983); *Fadjo* v. *Coon*, 633 F.2d 1172, 1175 (1981);

242

*J.P.* v. *DeSanti,* 653 F.2d 1080, 1088 (1981) ; *Duplantier* v. *United States,* 606 F.2d 654, 669 (1979) ; *Plante* v. *González,* 575 F.2d 1119, 1127 y ss. (1978) ; L. Tribe, *American Constitutional Law,* Nueva York, The Foundation Press, 1978, págs. 886 y ss., 966–973 ; A. De Miguel Castaño, *Derecho a la intimidad frente al derecho a la información. El ordenador y las leyes de protección de datos,* 86 Rev. Gen. Leg. Jur. 319, 335 y ss. (1983) ; M. Seng, *The Constitutional and Informational Privacy, or How So-Called Conservatives Countenance Governmental Intrusion Into a Person's Private Affairs,* 18 J. Mar. L. Rev. 871, 877 (1985) ; T. Gerety, *Redefining Privacy,* 12 Harv. C.R.-C.L. L. Rev. 233 (1977) ; Project, *Government Information and the Rights of Citizens,* 73 Mich. L. Rev. 971, 1221 y ss. (1975). *Cf. Thornburgh* v. *Am. College of Obstetricians and Gynecologist,* 54 L.W. 4618, 4623 (Op. de 1986). En este caso debemos elaborar sobre la modalidad de intimidad en la información personal, ya que no cae dentro de la denominada modalidad de autonomía —tomar decisiones importantes sobre la vida íntima o familiar sin la intervención del Estado.(⁵) Sobre esa modalidad, por ejemplo, véanse: *Pueblo* v. *Duarte Mendoza,* 109 D.P.R. 596 (1980) ; *Figueroa Ferrer* v. *E.L.A.,* supra; *Thornburg* v. *Am. College of Obstetricians and Gynecologist,* supra; *Roe* v. *Wade,* 410 U.S. 113 (1973) ; *Griswold* v. *Connecticut,* 381 U.S. 479 (1965).

## III.

*Intimidad en la información personal*

La modalidad de intimidad en la información de la persona no se ha definido adecuadamente; sus parámetros aún

---

(⁵) Estas dos categorías amplias —autonomía e información— constituyen un mínimo conceptual; los miembros de la Comisión Constituyente tuvieron la intención de plasmar en nuestra Constitución una garantía más amplia del derecho a la intimidad. *Figueroa Ferrer* v. *E.L.A.,* 107 D.P.R. 250 (1978) ; *Arroyo* v. *Rattan Specialties, Inc.,* 117 D.P.R. 35 (1986), y *E.L.A.* v. *Hermandad de Empleados,* 104 D.P.R. 436 (1975).

no se han fijado. Probablemente, debido a la existencia de leyes que reglamentan el uso de la información obtenida por el Gobierno, el derecho de acceso a la información a base de la libertad de expresión, al igual que la modalidad de intimidad en la información, no se ha desarrollado plenamente en la jurisprudencia federal. Véase el *Privacy Act*, de 31 de diciembre de 1974, Pub. L. 93–579, 88 Stat. 1897, 5 U.S.C. sec. 552a; también véanse las leyes federales citadas en U.S. Congress, Office of Technology Assessment, *Federal Government Information Technology: Electronic Record Systems and Individual Privacy*, Washington, Gov't. Printing Off., junio 1986, pág. 15, y en G. Trubow, *Information Law Overview*, 18 J. Mar. L. Rev. 815, 824–825 (1985). Estas leyes, en la medida que cumplen con las garantías mínimas del derecho a la intimidad en la información, reducen el riesgo del mal uso de los datos personales de los ciudadanos. En las jurisdicciones donde el acceso a la información personal está adecuadamente reglamentado el riesgo de intromisiones indebidas en el derecho a la intimidad se minimiza. Esta situación hace que los ciudadanos tarden en cobrar plena conciencia de los grandes daños que se pueden causar al infringírsele la libertad de controlar la información sobre su persona.(⁶) Gerety, *op. cit.*,

---

(⁶) En *Whalen* v. *Roe*, 429 U.S. 589, 605–606 (1977), unos ciudadanos impugnaron un esquema de ley de Nueva York que requería y mantenía información sobre ciertos medicamentos y drogas recetadas. El Tribunal Supremo convalidó ese esquema de ley basándose en gran medida en las garantías de confidencialidad y seguridad que tenía el esquema legislativo impugnado. En esa ocasión el Juez Stevens al emitir la opinión del Tribunal expresó:

"A final word about issues we have not decided. *We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files.* The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. *The right to collect and use such data for public purposes is typically ac-*

págs. 281 y 287 y ss.; Project, *Government Information* . . . , *op. cit.*, págs. 1296–1297. Distinto a la violación de otros derechos, la intromisión indebida con el derecho a la intimidad suele producir daños personales irreparables. Tribe, *op. cit.*, pág. 967; Gerety, *op. cit.*, pág. 292. Esta situación se agrava en Puerto Rico, pues no existe una legislación similar al *Privacy Act* de 1974 (5 U.S.C. sec. 552a). [7]

Un elemento indispensable en el derecho a la intimidad —en sus dos modalidades— es el *control* que se le debe reconocer y proteger al ciudadano sobre los distintos valores inmersos en este derecho: valores tales como la formación de la identidad, la vida íntima y familiar y la autonomía en la toma de decisiones importantes. *Thornburgh* v. *Am. College of Obstetricians and Gynecologist*, supra, págs. 4625–4627 (Stevens, J., concurrente); *Nixon* v. *Administrator of General Services*, supra, págs. 458–459; *Plante* v. *González*, supra. "La prueba del polígrafo interviene directamente con los pensamientos y las ideas de la persona y ésta *no tiene control* sobre lo que divulga." (Énfasis nuestro.) *Arroyo* v. *Rattan Specialties, Inc.*, supra, pág. 49. "If there is a quintessential zone of hu-

---

companied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances *that duty arguably has its roots in the Constitution,* nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data —whether intentional or unintentional— or by a system that did not contain comparable security provisions." (Énfasis nuestro y escolio omitido.)

[7] Adviértase que el *Privacy Act* se está revisando por el Congreso de Estados Unidos. La crítica constante a esa legislación es su incapacidad para realizar los objetivos que le dieron vida: proteger adecuadamente la data personal de los ciudadanos, proveer para que éstos puedan controlar el uso de su información y establecer mecanismos adecuados para el uso correcto por el Gobierno de dicha información. U.S. Congress, Office of Technology Assessment, *Federal Government Information Technology: Electronic Record System and Individual Privacy*, Washington, Gov't. Printing Off., junio 1986, págs. 4–8.

man privacy it is the mind. *Our ability to exclude others* from our mental processes is intrinsic to the human personality." (Escolio omitido y énfasis nuestro.) *Long Beach City Emp.* v. *City of Long Beach*, 719 P.2d 660, 663 (Cal. 1986). Tribe, *op. cit.*, pág. 966; A. Westin, *Privacy and Freedom*, Nueva York, Atheneum, 1968, pág. 42; Trubow, *op. cit.*, pág. 817; U.S. Congress, *Federal Government Information Technology . . .*, *op. cit.*, pág. 14; Gerety, *op. cit.*, pág. 261 y ss.; Project, *Government Information . . .*, *op. cit.*, pág. 1253; De Miguel Castaño, *Derecho a la intimidad . . .*, *op. cit.*, pág. 337.

El derecho de intimidad en la información personal tiene varias modalidades: (1) adquisición de esta información por el Gobierno: *Thornburgh* v. *Am. College of Obstetricians and Gynecologist*, supra; *Whalen* v. *Roe*, supra; *Nixon* v. *Administrator of General Services*, supra; *E.L.A.* v. *P.R. Tel. Co.*, 114 D.P.R. 394 (1983); *Arroyo* v. *Rattan Specialties, Inc.*, supra; *Plante* v. *González*, supra; *Duplantier* v. *United States*, supra; *Barry* v. *City of New York*, supra; *Fadjo* v. *Coon*, supra; *Long Beach City Emp.* v. *City of Long Beach*, supra; (2) retención prolongada por el Gobierno de la información adquirida: *Whalen* v. *Roe*, supra; *Nixon* v. *Administrator of General Services*, supra; *Plante* v. *González*, supra; *Duplantier* v. *United States*, supra; *Barry* v. *City of New York*, supra; (3) divulgación de esa información a terceros o a otras agencias del Gobierno, sin el previo consentimiento del ciudadano afectado. *Rodríguez* v. *Scotiabank de P.R.*, 113 D.P.R. 210, 216–217 (1982); *In re Carácter Público Exps. A.E.A.*, 116 D.P.R. 412 (1985); *Tavoulareas* v. *Washington Post Co.*, supra; cf. *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20 (1984); *California Bankers Assn.* v. *Shultz*, 416 U.S. 21, 78–79 (1974) (Powell, J., concurrente), y (4) acceso del ciudadano a su información personal recopilada por el Gobierno sobre su persona. Véase lo expuesto en la parte IV de

esta opinión, *infra*; en general también véase a Tribe, *op. cit.*, pág. 966 y ss. (⁸)

Independientemente de los valores inmersos en el derecho a la intimidad, la modalidad de intimidad en la información requiere protección constitucional; de lo contrario, otras garantías fundamentales de nuestra Constitución podrían quedar indebidamente inhibidas. Derechos tales como el de la libertad de expresión y de asociación muchas veces se coartan cuando se les requiere a individuos o grupos que informen al Gobierno las asociaciones políticas, culturales o de otra índole a las que pertenecen. *Cf. Arroyo* v. *Rattan Specialties, Inc.*, supra (actividades gremiales); *Eastland* v. *United States*

_____

(⁸) El profesor Tribe, *op. cit.*, págs. 966-967, explica:

"Among the rights of personality that should be of central concern are those that relate to the presentation of self . . . in the more general sense of controlling the mass of information by which the world defines one's identity. Of concern here are neither techniques of information-gathering that independently offend such constitutional guarantees as those of the first and fourth amendments, as in unlawful search and seizure, nor independently unconstitutional uses of information already in government's possession, nor even those informational probes thought to be objectionable because they unduly chill the exercise of otherwise protected rights of personal choice with respect to expression or association or some other specially protected sphere of action, but something at once more general and elusive.

"*Of concern in this section is any system of governmental information-gathering, information-preservation, and/or information-dissemination that threatens to leave individuals with insufficient control over who knows what about their lives.* Such control must be understood as a basic part of the right to shape the 'self' that one presents to the world, and on the basis of which the world in turn shapes one's existence.

·    ·    ·    ·    ·    ·    ·    ·

"At stake, therefore, is not the relatively narrow set of fourth amendment safeguards but the more general guarantee that liberty will not be infringed without due process of law. Government should be recognized to have a duty to provide reasonable assurance (1) that it is not needlessly or in breach of the terms on which information was gathered, (a) maintaining or (b) releasing (or encouraging maintenance or release of) information about people, however accurate; and (2) that such information as government either maintains or releases (or encourages others to maintain or release) is indeed as accurate as it can reasonably be made." (Énfasis suplido.)

*Servicemen's Fund*, 421 U.S. 491 (1975); *N.A.A.C.P.* v. *Alabama*, 357 U.S. 449 (1958); Project, *Government Information* . . . , *op. cit.*, págs. 1287–1289. Esta información sólo se puede requerir cuando exista un propósito gubernamental importante o apremiante, según los intereses del caso. Hemos resuelto que el derecho a la intimidad en su modalidad de autonomía o en una fase combinada de autonomía e información, se violenta cuando se le requiere cierto tipo de información a las parejas que deciden divorciarse por mutuo acuerdo y cuando a un empleado, como norma general, se le requiere información sobre su vida íntima y familiar. *Cf. Figueroa Ferrer* v. *E.L.A.*, supra; *Arroyo* v. *Rattan Specialties, Inc.*, supra. En el ámbito federal también se ha resuelto que, como regla general, cuando a la mujer se le requiere recibir o brindar información relacionada a una decisión de practicarse un aborto se viola su derecho a la intimidad en la fase combinada. *Thornburgh* v. *Am. College of Obstetricians and Gynecologist*, supra. Este factor inhibitorio amerita que este Tribunal esté vigilante ante ese tipo de intromisión que aunque indirecta, resulta igualmente perjudicial.

IV

*Acceso a la información personal*

El acceso a la información personal en poder del Gobierno es un elemento esencial para la protección del derecho a la intimidad. Antes expresamos que el *control* del individuo sobre los elementos que componen las garantías a la intimidad es un valor esencial de este derecho. Sin acceso a la información personal no se puede controlar la confiabilidad de la misma, tampoco se sabría qué información personal retiene el Gobierno, y cuánta información divulga a otras agencias o a terceras personas. Para que la persona pueda ejercer su derecho a requerir que se corrija la información en poder del Gobierno es necesario el acceso. Cuando las instituciones del

Gobierno toman decisiones o transmiten información personal a otras agencias sin el debido control y corrección por parte del individuo afectado, esa data puede constituir un mero "chisme institucional". Decisiones importantes tomadas a base de esta información producen graves errores y dejan a la persona en un estado de completa indefensión frente a la maquinaria del Estado. Gerety, *op. cit.*, pág. 287.[9] En el caso de autos, el Gobierno adquirió información sin permitirle al demandante acceso a ella. A base de esta información tomó la importante decisión de no permitirle continuar en la Policía y dejó plasmado en su expediente personal el resultado de la investigación y su destitución como cadete. Todo esto lo hizo sin que el demandante tuviese la oportunidad de verificar la veracidad de la información utilizada por el Gobierno para llegar a esta determinación.

Para evitar el abuso en el uso de la información personal se han elaborado guías para su manejo. Las leyes que contienen estos parámetros y los autores que han comentado sobre estas guías, todos, incluyen el acceso a dicha información como un factor esencial para garantizar la garantía de intimidad y confiabilidad. Véanse: el *Privacy Act* de 1974 (5 U.S.C. sec. 552a (d) ) ; Ley de Personal del Servicio Público de Puerto

---

[9] T. Gerety, *Redefining Privacy*, 12 Harv. C.R.-C.L. L. Rev. 233, 287 (1977), expresa que cuando el Gobierno transmite información o toma decisiones a base de información personal sobre la que no se ha tenido control, "the information is not usually made public but simply passed on in violation either of the original confidence, if any, or else of the original purpose for which it was gathered and stored. This comes, trivially, to a kind of institutionalized gossip, and its vice is its tendency to distortion and incompleteness, tempting others to make decisions about us, as gossips will, behind our backs and on uncertain grounds.

"What is not at all trivial about this is that the gossip and the decisions based upon it are institutionalized at such a level and to such an extent as to deprive us of autonomy in information at just those points where autonomy in other important life-choices is at stake. We are often forced to present ourselves for judgments by others occupying decisive institutional positions in our society and in our lives: they will make judgments about a job, a mortgage, or even a sentence or parole".

Rico, Ley Núm. 5 de 14 de octubre de 1975, Sec. 5.8(4), 3 L.P.R.A. sec. 1348(4); Westin, *op. cit.*, pág. 325; U.S. Congress, *Federal Government Information Technology . . .* , *op. cit.*, págs. 19–21; Trubow, *op. cit.*, pág. 823; Gerety, *op. cit.;* Project, *Government Information Technology, op. cit.*, págs. 1253–1256; De Miguel Castaño, *op. cit.*, págs. 320, 337–340. En países como Alemania, Austria, Bélgica, Dinamarca, Francia, Inglaterra, Luxemburgo, Noruega, Suecia y Canadá se ha reconocido en leyes de protección de datos el acceso a la información personal. Ibíd, págs. 385–387.([10]) Para que el ciudadano pueda ejercer el derecho de intimidad en la información —en cualquiera de las modalidades señaladas— es indispensable el acceso a dicha información. Por todo ello, concluimos que el derecho a la intimidad reconocido por nuestra Constitución incluye también el acceso a la información personal recopilada por el Gobierno, ya que esto constituye uno de los elementos vitales y esenciales de ese derecho.

Una vez concluido lo anterior debemos, pues, determinar el criterio de revisión a utilizarse cuando en relación con una solicitud de acceso a información personal el Estado, en este caso la Policía, niega el acceso a base del carácter confidencial de la información.

El Quinto Circuito de Apelaciones de Estados Unidos por voz del Juez Wisdom en *Plante* v. *González,* supra, fue el primer Tribunal Federal de Apelaciones en elaborar un criterio de revisión para seguirse en casos de derecho a la intimidad en la información, en su modalidad de divulgar información

---

([10]) Una encuesta de opinión pública realizada en Estados Unidos determinó que "[o]verwhelming mayorit[y] of the public ¡and leadership groups think that people should have access to any files that the federal government has on them regardless of the expense and the time consumed by government agencies in responding to such request". Harris & Asoc., y Westin, editor, *The Dimensions of Privacy: A National Opinion Research Survey of Attitudes Toward Privacy,* Nueva York, Garland Publ., 1981, págs. 9, 39–40.

al Gobierno. ([11]) Dicho tribunal, luego de hacer un recuento de *Whalen* v. *Roe*, supra, y de *Nixon* v. *Administrator of General Services*, supra, expresó que el Tribunal Supremo federal no había brindado guías específicas sobre este punto. ([12]) *Plante* v. *González*, supra, págs. 1133–1134; y concluyó que para revisar, el criterio de balance de intereses era el apropiado. Indicó que "[s]omething more than rationality must be demonstrated". Ibíd. Señaló los intereses importantes que el Estado pretendía promover, y determinó que "[t]he question is whether the Sunshine Amendment significantly promotes [the important state concerns and goals]". Ibíd. ([13])

El Sexto Circuito de Apelaciones en *J.P.* v. *De Santi*, supra, pág. 1088, al igual que el Tercer Circuito —*United States* v. *Westinghouse Elec. Corp.*, 638 F.2d 570, 577–578 (1980)— y el Segundo Circuito —*Barry* v. *City of New York*, supra, pág. 1559— se han unido al criterio de revisión desarrollado por el Quinto Circuito en *Plante* v. *González*, supra, al expresar que "some form of intermediate scrutiny or balancing approach is appropriate as a standard of review".

El Tribunal de Apelaciones para el Distrito de Columbia se unió a esa corriente, pero de forma más flexible. *Tavoula-*

---

([11]) En ese caso varios senadores del estado de Florida impugnaron la validez constitucional de una ley que les requería divulgar información sobre sus finanzas a una comisión del Gobierno. En esa ocasión el Quinto Circuito expresó "[o]ur problem in this section is to determine the proper standard of review of the claims, then apply it. The answer is not easy." *Plante* v. *González*, 575 F.2d 1119, 1130 (1978).

([12]) El Tribunal Supremo de Estados Unidos no identificó el criterio de revisión que usó en *Whalen* v. *Roe*, supra, y en *Nixon* v. *Administrator of General Services*, 433 U.S. 425 (1977); sin embargo, en *Nixon* v. *Administrator of General Services* el tribunal expresó: "any intrusion must be *weighed* against the public interest." (Énfasis nuestro.) Ibíd., pág. 458. Y luego se refirió a la validez de la ley impugnada en términos de *reasonableness*. Ibíd., pág. 460.

([13]) Ese Circuito consistentemente ha confirmado el uso de este criterio. *Duplantier* v. *United States*, 606 F.2d 654, 669–671 (1979); *Fadjo* v. *Coon*, 633 F.2d 1172, 1176 (1981).

*reas* v. *Washington Post Co.*, supra, pág. 1023.(14) Ese tribunal expresó: "We add, however, that *our adoption of a balancing approach does not preclude in all circumstances the government's need to present a compelling interest to justify an intrusion.* Indeed, when the intrusion is 'Severe', a compelling interest is required to justify the intrusion. 'Severe' intrusion includes public dissemination of confidential information as opposed to disclosure of such information only to the government or other litigants." (Énfasis suplido.)

En *E.L.A.* v. *P.R. Tel. Co.*, supra, pág. 403, hicimos un análisis bajo la Sec. 10 del Art. II de nuestra Constitución similar al adoptado por los tribunales federales para determinar la razonabilidad de la citación administrativa allí impugnada.(15) Bajo ese examen de intimidad —a base de la Sec. 10 de nuestra Carta de Derechos— se ratificó que "el criterio dominante debe continuar siendo la existencia de una expectativa razonable de que se respete la intimidad del individuo". *E.L.A.* v. *P.R. Tel. Co.*, supra, pág. 403; *Pueblo* v. *Lebrón*, 108 D.P.R. 324, 331 (1979); *Katz* v. *United States*, 389 U.S. 347 (1967). Concluimos que, de acuerdo a los hechos específicos del caso, la invasión a la intimidad era mínima, pues, "no [estaba] envuelto [allí] el derecho a la asociación, la secretividad de las comunicaciones y papeles propios, la dignidad de su persona, la inviolabilidad de su morada sin orden judicial suficiente y derechos análogos—frente a la clara necesidad de acceso a información *estrictamente limitada,* como la que se [requería allí], para el cumplido ejercicio del poder investigativo del Estado bajo la autoridad concedida por man-

---

(14) En esta ocasión se citó parte del voto concurrente del Juez Brennan en *Whalen* v. *Roe,* supra: "Broad dissemination by state officials of [personal] information . . . would presumably be justified only by compelling state interests."

(15) En esa ocasión la Oficina de Asuntos Monopolísticos del Departamento de Justicia requirió de la Puerto Rico Telephone Co. el nombre del usuario, dirección, fecha de instalación y nombre de usuario previo relacionado con ciertos números de teléfonos.

dato expreso de ley". (Énfasis suplido.) *E.L.A.* v. *P.R. Tel. Co.*, supra, págs. 403–404. Como se observará, al constituir los hechos sólo una invasión mínima a la intimidad y no estar involucrados otros valores fundamentales, implícitamente acogimos el criterio flexible de balance de intereses. Así en *Arroyo* v. *Rattan Specialties, Inc.*, supra, donde estaban combinadas las dos modalidades de intimidad —autonomía e información— y la invasión a la intimidad no era mínima, usamos el criterio estricto de revisión. En *Arroyo* v. *Rattan Specialties, Inc.*, supra, los intereses económicos del demandado no pudieron superar los intereses del demandante en evitar que el patrono se inmiscuyera en su vida íntima y familiar y que pudiera obtener, de forma indebida, información sobre las actividades personales, gremiales o políticas del señor Arroyo.

## V

### *Conclusión*

Aplicando la doctrina expuesta llegamos, pues, al mismo resultado que anuncia la opinión del Tribunal. En este caso el señor López Vives reclama acceso a información que sobre su persona tiene la Policía de Puerto Rico como resultado de una llamada investigación confidencial. Esa información puede revelar trazos de la personalidad del peticionario; por ejemplo, puede incluir sus hábitos y costumbres, los grupos de amistad, de trabajo o de otra índole con los cuales él suele asociarse. El peticionario tiene derecho de acceso a esa información para poder requerirle a la Policía que corrija cualquier data incorrecta o para poder suplir información que complemente o explique la conducta descrita en el informe.[16] De

---

[16] El acceso a este tipo de información también es necesario para otros propósitos tales como, el poder solicitar que la información se elimine del expediente o que no se divulgue a otras agencias o departamentos del Gobierno o a terceras personas.

esta forma, la Policía podrá tomar una decisión más correcta sobre la permanencia del cadete López Vives en su trabajo.

La expectativa de intimidad del peticionario de tener acceso a su información personal es muy grande. Existen leyes —federales y estatales— que en situaciones similares otorgan el derecho al acceso solicitado. *Cf. Privacy Act*, 5 U.S.C. sec. 552a(d); Ley de Personal del Servicio Público, Ley Núm. 5 de 14 de octubre de 1975, Sec. 5.8(4), 3 L.P.R.A. sec. 1348(4). La doctrina del debido proceso de ley procesal abona a esa conclusión. Véanse: *Santiago* v. *Trib. Exam. de Médicos*, 118 D.P.R. 1 (1986); *Alicea* v. *Córdova*, 117 D.P.R. 676 (1986) (Naveira de Rodón, J., concurrente); *Román* v. *Trib. Exam. de Médicos*, 116 D.P.R. 71 (1985); *Vélez Ramírez* v. *Romero Barceló*, 112 D.P.R. 716, 729 (1982). El Art. 21 del Reglamento de la Policía de Puerto Rico —véase el Apéndice de esta opinión— fortalece esa expectativa de intimidad. Ese interés hay que pesarlo contra el interés de secretividad levantado por la Policía.

Los intereses adelantados por el Estado, arguiblemente, son: (1) reclutar los mejores cadetes para el Cuerpo de la Policía, lo que lleva consigo el interés de mejorar la seguridad pública; (2) mantener la seguridad de las personas que de alguna forma intervinieron en la investigación realizada al cadete, y (3) mantener la confidencialidad del procedimiento de investigación. Los tres intereses mencionados son importantes y en ocasiones constituyen valores apremiantes que merecen gran protección. Sin embargo, este análisis lo debemos realizar según las circunstancias particulares de cada caso.

El manto de confidencialidad sobre el informe del peticionario no adelanta significativamente los intereses anunciados. En este caso se conocían los nombres de las personas que brindaron información a la Policía. Opinión del Tribunal, *ante*, pág. 236. El proceso y los mecanismos investigativos de la Policía no corren ningún riesgo de ser divulgados. Lo que solicitó

el peticionario fue el informe final con los datos personales de él, no las técnicas investigativas de la Policía. [17] Debe tenerse presente también que estamos ante una investigación terminada y no en proceso. Los elementos de seguridad pública son importantes; sin embargo, en este caso en particular no son tan significativos. La forma en que mejor se beneficia a la Policía, y por ende la seguridad pública en general, es tomando una decisión bien informada sobre las aptitudes y capacidades del peticionario. Esto se consigue precisamente permitiendo el acceso solicitado. [18] Las otras etapas del procedimiento deliberativo —en cuanto a la permanencia del cadete en el Cuerpo de la Policía— permanecen inalteradas al permitir el acceso. Brindar esa información no significa que el cadete formará parte automáticamente del Cuerpo de la Policía.

Resumiendo, el peticionario López Vives tiene una gran expectativa de intimidad en lograr acceso a su información personal. Después de todo, existen en Puerto Rico leyes análogas —federales y estatales— que permiten el acceso solicitado en circunstancias similares. Y, finalmente por parte del Estado, los intereses importantes o apremiantes de la Policía no se adelantan significativamente con la medida tomada, mientras que el derecho del peticionario a la intimidad sí se afecta significativamente.

Por todo lo anterior, concurrimos con el resultado anunciado en la opinión del Tribunal.

---

[17] Al igual que a la mayoría, nos llama la atención que parte del contenido del llamado "informe confidencial" se hizo formar parte del alegato de la parte recurrida que es un documento público.

[18] Siguiendo este procedimiento se le da una garantía adicional de debido proceso de ley al peticionario.

## APÉNDICE

### ARTÍCULO 21 DEL REGLAMENTO DE PERSONAL
### DE LA POLICÍA DE PUERTO RICO

## Art. 21—EXPEDIENTES DE EMPLEADOS

Los expedientes de los empleados deberán reflejar el historial completo de éstos desde la fecha de su ingreso original al servicio público hasta el momento de su separación definitiva. La Policía de Puerto Rico será responsable de la conservación, custodia y mantenimiento de los expedientes de los empleados, según se dispone más adelante . . . :

1. Los expedientes de los empleados se clasificarán como activos o inactivos. Se considerarán expedientes activos los correspondientes a empleados que se mantengan vinculados al servicio, e inactivos los expedientes de los empleados que se han desvinculado del servicio.

2. *A todo empleado a quien se le extienda cualquier tipo de nombramiento, se le abrirá un expediente,* que se identificará con el nombre completo del empleado y el número de seguro social. *En este expediente se archivará y* conservará, entre otros, los siguientes documentos:

   a. Historial personal
   b. Examen médico
   c. Copia autenticada del certificado de nacimiento
   d. Notificación de nombramiento y juramento
   e. Informes de cambios en cuanto a status, sueldo, clasificación, etc.
   f. Evaluaciones sobre el trabajo del empleado
   g. Documentos que reflejen la concesión de aumentos de sueldos o cualquier otro aspecto relacionado con la retribución
   h. Cartas de reconocimiento por altas ejecutorias, excelencia en el servicio, o mejoras administrativas
   i. *Documentos que reflejen acciones disciplinarias,* así como resoluciones de la Junta de Apelaciones al respecto
   j. Certificaciones de servicios prestados al Gobierno

k. Cartas de enmiendas a documentos que formen parte del expediente

*l.* Comunicaciones sobre ascensos, traslados y descensos

m. *Récord de adiestramientos*

n. Documentación relacionada con la participación de empleados en el Sistema de Retiro de los Empleados del Gobierno y sus instrumentalidades

*o.* Documentos sobre becas o licencias para estudios, con o sin sueldo, tales como contratos, evidencia de estudios y solicitudes y autorizaciones de pago de matrícula

p. Récord de licencias

q. Récord de accidentes por causas ocupacionales

r. Autorizaciones de descuento de sueldo para cuotas de asociaciones, obligaciones contraídas con el Sistema de Retiro, la Asociación de Empleados u otras autorizadas por ley. Los expedientes de los empleados deberán incluir una relación de los documentos contenidos en los mismos.

3. Se enviará a la Administración de los Sistemas de Retiro dos (2) copias de todos aquellos documentos que reflejen el historial y acciones de personal de cada empleado (con excepción de los casos de empleados con status transitorio en puestos de duración fija), tales como:

a. Historial personal

b. Examen médico

c. Copia autenticada del certificado de nacimiento

d. Notificación de nombramiento y juramento

e. Informes de cambios

f. Cartas de reconocimiento, amonestaciones, castigos, notificación de ascensos, traslados y descenso.

4. Examen de los expedientes

a. El custodio de los expedientes de los empleados de la Policía de Puerto Rico será el oficial de personal.

b. *Los expedientes individuales de los empleados tendrán carácter confidencial y podrán ser examinados por la Policía únicamente para fines oficiales o cuando lo autorice por escrito el propio empleado para otros fines.* Los custodios de los expedientes serán responsables por la confidencialidad, y el uso o divulgación en forma es-

crita u oral de la información contenida en los expedientes.

c. *Todo empleado tendrá derecho a examinar su expediente en compañía del custodio de los expedientes.* En caso de que el empleado esté incapacitado por razón de enfermedad física que le impida asistir personalmente al examen del expediente, podrá autorizar por escrito a un representante para que lo examine. En el caso de que el impedimento sea incapacidad mental, el expediente podrá ser examinado por la persona que sea designada tutor por el tribunal correspondiente. La solicitud o autorización escrita para examinar expedientes deberá radicarse ante el Negociado de Personal de la Policía de Puerto Rico, por lo menos con tres (3) días de antelación a la fecha en que se solicita el examen, la cual formará parte del expediente del empleado.

d. Los empleados podrán obtener copia de los documentos contenidos en sus expedientes mediante el pago del costo de reproducción, más cualesquiera derechos que por ley se exigieren. Las solicitudes de copia se harán por escrito con no menos de cinco (5) días de antelación. En el plazo indicado, se entregará copia del documento solicitado.

e. Los custodios de los expedientes podrán delegar en subalternos la representación oficial, a los fines del examen del expediente.

4. [*sic*]* Conservación y disposición de los expedientes— Se conservará[n] y mantendrá[n] archivados, firmemente adheridos, todos los documentos pertenecientes al expediente individual de empleados activos e inactivos.

La disposición de los expedientes de los empleados se hará conforme a las siguientes normas:

a. En el caso de todo empleado que se separe del servicio por cualquier causa, se retendrá y conservará el expediente personal inactivo por un período de cinco (5) años. La disposición final se hará conforme a las nor-

---

*En el texto de esta regla el número cuatro está repetido y no aparece ninguna sección como 4(c) y 4(e).

mas del Reglamento para la Administración del Programa de Conservación y Disposición de Documentos Públicos en la Rama Ejecutiva.

b. En el caso de que un empleado que se haya separado del servicio se reintegre a un puesto en la Policía de Puerto Rico antes del período de cinco (5) años, ésta reactivará el expediente e incorporará los documentos subsiguientes que correspondan a la reanudación y continuación de sus servicios. Si otra agencia solicita el expediente del empleado por razón de que éste se haya reintegrado al servicio, se le remitirá a dicha agencia el expediente del empleado en un período no mayor de treinta (30) días siguientes a la fecha de la solicitud, a fin de que todo el historial del empleado en el servicio público se conservare en un solo expediente.

Si el empleado separado solicitara una pensión de un sistema del retiro del Gobierno de Puerto Rico, tal sistema podrá solicitar el expediente del ex-empleado y la Policía de Puerto Rico lo remitirá al sistema. En adelante el sistema de retiro conservará el expediente.

d. En todo caso en que ocurra la muerte de un empleado activo que no sea participante del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, la Policía de Puerto Rico conservará el expediente y dispondrá de él de acuerdo a los normas del Reglamento para la Administración del Programa de Conservación y Disposición de Documentos de la Rama Ejecutiva. En caso de que el empleado sea un participante de dicho sistema de retiro, se enviará el expediente al Sistema de Retiro, junto con el Informe de Cambio notificando el fallecimiento.

Siempre que se transfiera un expediente de un empleado o de un ex-empleado de la Policía de Puerto Rico a una agencia comprendida en la Administración Central o a un Administrador Individual, se preparará una certificación de los documentos que se incluyen en el expediente y la agencia que lo recibe verificará y certificará el recibo de los documentos.

f. Luego de que un expediente se mantenga inactivo cinco (5) años en la Policía de Puerto Rico, se preparará una tarjeta acumulativa de los servicios prestados por

el empleado, incluyendo todas las acciones de personal, indicando la fecha en que éstas se llevaron a cabo y los salarios devengados. La información incluida en la tarjeta acumulativa constituirá un resumen completo del historial del empleado. El custodio de los expedientes certificará la veracidad de la información y se procederá con el expediente de conformidad con el Reglamento del Programa de Conservación y Disposición de Documentos Públicos en la Rama Ejecutiva.

g. Los formularios y cartas que formen parte del expediente se conservarán por el tiempo que se conserve el expediente.

h. Los documentos correspondientes a la acumulación y uso de licencias se conservarán por un período máximo de cinco (5) años, al cabo de los cuales se retirarán para disposición. No obstante, podrá destruirse todo récord de asistencia inmediatamente después de haber sido intervenido por la Oficina del Contralor.

i. Los documentos referentes a deudas al erario u obligaciones de los empleados se retendrán en los expedientes hasta tanto se haya saldado la deuda, o aprobado los cursos en el caso de becas, licencias o pagos de matrícula.

j. Se mantendrá un registro en el expediente del empleado de los documentos que hayan sido dispuestos al completar el tiempo de conservación.

5. Otros documentos relativos a la administración de personal se conservarán de acuerdo a las siguientes disposiciones:

a. Los documentos referentes a la clasificación de los puestos se conservarán mientras exista el puesto, independientemente de su evolución. Luego de que se elimine el puesto se mantendrá inactivo por un (1) año, y se procederá a su disposición de acuerdo al Reglamento del Programa de Conservación y Disposición de Documentos Públicos en la Rama Ejecutiva.

b. Las certificaciones de elegibles se mantendrán activas por un (1) año, a partir de la fecha de expedición. Luego se conservarán inactivas por otro año y se dispondrá de ellas de acuerdo al Reglamento para la Con-

servación y Disposición de Documentos Públicos en la Rama Ejecutiva.

c. Los registros de elegibles se conservarán inactivos por un (1) año, a partir de la fecha de cancelación o vencimiento, y se dispondrá de ellos de acuerdo a las disposiciones del Reglamento para la Conservación y Disposición de Documentos Públicos en la Rama Ejecutiva.

d. Las solicitudes de examen de personas que resulten inelegibles en los exámenes se conservarán por seis (6) meses. Las solicitudes de examen de las personas que resulten elegibles se conservarán por el tiempo que dure la vigencia del registro. Se dispondrá de ambas de conformidad a las disposiciones del Reglamento para la Conservación y Disposición de Documentos Públicos en la Rama Ejecutiva. (Énfasis suplido.) Págs. 166-173.