Rodríguez García, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Acude ante nos la firma Centrocamiones de Puerto Rico, Inc., solicitando que revoquemos la adjudicación que hiciera la Junta de Subastas del Municipio de Juncos, de una subasta para la adquisición de dos ambulancias. Concedimos término al Municipio de Juncos y a la firma Specialty Vehicles of Puerto Rico para comparecer, y así lo hicieron. Examinadas las posiciones de las partes, así como el derecho aplicable al caso, revocamos la determinación de la Junta de Subastas de Juncos, y resolvemos que es a Centrocamiones que se tiene que adjudicar la buena pro.
*1154 I. Trasfondo fáctico.
i
En 18 de agosto de 2001, la Junta de Subastas del Municipio de Juncos (la Junta) publicó en el periódico Primera Hora un Aviso de Subastas en el cual se incluia la Subasta Número 33 2001-2002, "Para la Adquisición de dos Ambulancias Equipadas Tipo II", a celebrarse el día 28 de agosto de 2001, en el Salón Herradura, Segundo Nivel de la Casa Alcaldía. (Apéndice del recurso, Exhibit 1) 
El anuncio contenía el resumen usual de condiciones de la subasta, y la consabida advertencia de que: "[l]a Junta de Subastas del Municipio de Juncos se reserva el derecho de aceptar o rechazar todas o cualquiera de las proposiciones recibidas y adjudicar la Buena Pro, no solamente mediante las condiciones de precio y sí tomando en consideración aquellas ofertas que se ajusten a los mejores intereses del Municipio de Juncos".
El Municipio recibió las licitaciones de tres firmas productoras de ambulancias, la distribuidora Royal Motors Co. ofreciendo un producto fabricado por General Motors, y dos ofreciendo conversiones a ambulancias en que se utiliza como base un producto de la Ford Motor Company. Fueron éstas Centrocamiones de Puerto Rico, Inc., distribuidora de productos Ford, y Specialty Vehicles, Inc., distribuidora de Osage Ambulances, la cual utiliza como base una Van Ford.
ii
Las especificaciones de la subasta que se publicaron y notificaron inicialmente, están en el idioma Inglés, y a poco que las examinamos notamos que las especificaciones contenían enumerados ciertos aditamentos con un lenguaje particular que parecía ser tomado de las especificaciones de un fabricante en particular, lo que luego hemos podido comprobar. Así tenemos por ejemplo:
■ En el renglón Chasis se incluyen aditamentos que no tienen nada que ver con el chasis de la ambulancia, como "Tilt Steering Wheel & Cruise Control", y "Electric Windows & Door Locks", además de "Deluxe High Back Captains Chair".
■ En el renglón "Ambulance Conversion”, se incluye:
Full Length 8-Bar "Sled Style" Roll Cage Protecting Patient and Drivers Compartment.
Curb Side 6" Impact Protection Beam
Grip Strut Rear Step Bumper w/Rubber Dock Bumpers.
■ En el renglón "Interior" se incluye:
Rear Heat & Cool System Mounted Floor Level;
*Moisture Drains Directly Through Floor.
*Short Coolant Circulation Distance
*Eliminates Vertical Circulation of Coolant.
*Unit Easily Accesible for Maintenance
Del mismo modo sucede con los otros renglones como "Warning Systems", "Paint & Markings", "Electrical” y "Warranty" (en la cual no se exige garantía alguna).
Las especificaciones de la subasta contienen 26 condiciones, entre las que se incluye el número 26 que indica: "[n]o se enviarán por "FAX" Condiciones y/o Especificaciones".
Pero, es precisamente por vía de "fax" que el día 22 de agosto, (Apéndice, Exhibits 4 & 6) se le remitió a los potenciales licitadores la primera alteración de las especificaciones en que se hacen los siguientes cambios:
*1155 En el renglón "Chasis", (Apéndice Exhibit 7), el motor Turbo Diesel que era de 7.3 L (litros) se cambió a de 6.5 L, un motor menos potente, y en el renglón "Electrical", que decía "Ford OEM Dual Alternators", se le eliminó la palabra "Ford", posiblemente al darse cuenta de que se excluía a todo fabricante distinto al fabricante FORD. Se le unieron a los cambios dos Anejos, pág. 16 del Apéndice, relacionado con el equipo médico, y Exhibit 8, que indica que las ambulancias deben cumplir con las especificaciones federales KKK A218 22D, y que el tanque de oxígeno debe ser ubicado verticalmente a los pies del"Squad Bench".
En 25 de agosto de 2001, la recurrente Centrocamiones de Puerto Rico, Inc., sometió su licitación, cumpliendo con las especificaciones de la subasta, excepto con aquéllas que resultan ser específicas de las ambulancias marca OSAGE, elaboradas en Missouri, que distribuye la recurrida Specialty Vehicles of Puerto Rico.
El producto ofrecido por Centrocamiones se describe como:

“2002 Ford E-350 Super Van, motor Turbo Diesel v-8, transmisión automática de 4 velocidades con overdrive, aire acondicionado, conversión Ambulancia Tipo II KKK-1822-D por Taylor made, cumpliendo y excediendo las especificaciones solicitadas.

Precio por unidad sin arbitrios: $59,895.00

Entrega: 30-45 días después de recibir la orden de compra oficial.

Términos: Orden de Compra Oficial, neto 30. ”

Véase que Centrocamiones ofrece una Unidad Ford E-350 Super Van; no ofrece una "ambulancia Tipo II", porque como veremos, la designación de "Tipo II" es una de las clases de ambulancias que produce la firma Osage.
El 6 de septiembre de 2001, la Junta de Subastas del Municipio de Juncos dirige la carta que es el Exhibit 11, en que se indica que en aquella fecha de 6 de septiembre de 2001, se consideraron las tres proposiciones, y se resolvió adjudicar la subasta a Specialty Vehicles of Puerto Rico. Se indica en la carta:

“Lidiadores:

Comparecieron tres (3) lidiadores: Specialty Vehicles of Puerto Rico, Inc., Centrocamiones, Royal Motor Corp.

1. Compañía: Royal Motors

Propuesta:

Propuso una unidad Chervrolet Ambulancia Tipo II año 2002, precio por unidad es de $73,017.00, la entrega de 90 días laborables después de recibir la orden de compra. Fue el mayor postor y no favorece los mejores intereses del Municipio.

2. Compañía: Centrocamiones

Propuesta:

Propuso una Ford E-350, Super Van, Motor 7.3 litros Turbo Diesel año 2002, precio por unidad $59,895.00 y tiempo de entrega de 30 a 45 días después de recibir la orden de compra. No cumple con las siguientes 
*1156
especificaciones sometidas por la Junta de Subasta: Full Lenght 8 Bar, “Slep 
 (sic) Style” roll cage Protecting Patecting(sic) 
 and Drivers y el Grip Strup 
 Rear Step Bumber w/Rubber Dock Bumpers.

3. Compañía: Speciality Vehicles of Puerto Rico

Propuesta:

Propuso dos Ambulancias Tipo II de Osage Ambulance 2002, el costo por unidad es de $62,000.00 y la entrega es de 60 a 90 días calendario. Cumple con todas las especificaciones para esta subasta.

Adjudicación:

Tomando en consideración nuestra evaluación y el interés público, esta Junta de Subasta resuelve adjudicar la Subasta #33/2001-2002 de la Adquisición de dos Ambulancias Equipada Tipo II a Speciality Vehicles of Puerto Rico, aunque fue el segundo postor más bajo, pero cumplió con todas las especificaciones requeridas por la Junta de Subasta para esta Subasta y es quien mejor favorece los intereses del Municipio de Juncos. ”

iii
Según la referida comunicación, se descalifica de la subasta a Centro Camiones debido a que:

“No cumple con las siguientes especificaciones sometidas por la Junta de Subasta: Full Lenght 8 Bar, "Step Style" roll cage Protecting Patients and Drivers y el Grip Strut Rear Step Bumper w/Rubber Dock Bumpers. ”

Estos son los fundamentos de la descalificación de Centrocamiones.
Luego, se le adjudica a Specialty Vehicles of Puerto Rico, porque:
“Propuso dos Ambulancias Tipo II de Osage Ambulance 2002, el costo por unidad es de $62,000.00 y la entrega es de 60 a 90 días calendario. Cumple con todas las especificaciones para esta subasta. ”
El objetivo fundamental de las subastas es precisamente proteger el erario público consiguiendo la construcción de obras públicas y la adquisición de servicios de calidad para el gobierno al mejor precio posible. Para ello es necesario fomentar la competencia libre y transparente entre el mayor número de licitadores posible. RBR Construction, S.E. v. A.C.T y su Junta de Subastas,_D.P.R._(2000), 2000 J.T.S. 7.
Los tribunales tenemos el deber de asegurar que al efectuar sus gestiones de compra y contratación, las instrumentalidades públicas cumplen con la ley, con sus propios-procedimientos y que tratan de forma justa a los licitadores. En fin, que los dineros del pueblo se gastan en beneficio del interés público. Id.
Si bien es cierto que debemos gran deferencia a las determinaciones de las agencias administrates, cuando éstas no se encuentran sustentadas por evidencia sustancial en el récord o cuando son irrazonables, nada nos impide de intervenir. Nos encontramos ante una determinación arbitraria cuando es infundada o irrazonable. Id.
El Municipio de Juncos, en su comparecencia ante nos, sometió una Moción de Desestimación, y como parte de la misma nos somete cuatro (4) páginas a colores, y en una de dichas páginas nos presenta el vehículo que vende la firma Osage, de Linn, Missouri, a través de su agente Specialty Vehicles de Puerto Rico. Allí se nos indica un lugar en la red Internet, o "web site", designado www.osageambulances.com. Acudimos a dicho lugar y encontramos información valiosa para nuestra determinación en el presente caso.
Los tribunales podemos tomar conocimiento judicial de hechos que no son razonablemente objeto de *1157 controversia, por ser susceptibles de determinación inmediata y exacta, de fuentes que no pueden ser cuestionadas, como el web site de Osage, en este caso. Regla 11(A)(2) de las de Evidencia de 1979. Podemos tomar conocimiento judicial por iniciativa propia y a solicitud de parte. Regla 11(B) Id. Además podemos tomar conocimiento judicial en cualquier etapa de los procedimientos, incluyendo la etapa apelativa. Regla 11(D) Id.
Se toma conocimiento judicial de lo que nos ofrece el lugar en la red de Osage, www.osageambulances.com. Del lugar bajamos cierta información, de donde surge que las especificaciones ofrecidas por el Municipio de Juncos en la subasta, emanan de la literatura promocional de la firma Osage, a través de su agente Specialty Vehicles.
Encontramos que Osage fabrica cuatro (4) tipos de conversiones de ambulancias, a saber; Tipo I, Warrior; Tipo II, Travois; Tipo III, Brave; y Tipo IV Super Warrior. La oferta de Specialty Vehicles es la Tipo II, Travois. Esto aparece en la pieza de literatura de Osage, que unimos a la sentencia como ANEJO I.
Al examinar la literatura de la unidad Travois, ANEJO II de esta sentencia, encontramos el origen de la especificación mística utilizada en tres lugares: Uno, en las especificaciones que establece la Junta de Subasta; dos, en la minuta de la adjudicación de la subasta; y tres, en el alegato del Municipio de Juncos. Nos referimos a: 8-bar full length “sled” style roll cage, seguida de Roll bar over drivers compartment.
Además, encontramos el origen de unas especificaciones que no lo son, sino que constituyen unos puntos de venta de la Travois, y que indican:

“Floor mounted HVAC unit with overhead air distribution.

*Overhead Air Distribution w/floor level air return for optimum distribution

9 Moisture drains directly to ground

* Moisture drains directly through floor.

9 Decreased distance of coolant circulation

* Short coolant circulation distance.

9 Improved air movement and circulation

* Eliminates vertical circulation of coolant

9 Unit easily accessible for maintenance

* Unit easily accessible for maintenance
@ Return air charcoal filtered

Return air filtration”

En las especificaciones de la subasta, los puntos de venta (selling points) de la literatura de Osage, se modifican ligeramente y se convierten en las especificaciones como aparecen en los asteriscos (*).
Y finalmente encontramos un mensaje de la firma Osage, en que la firma indica que ha decidido dejar de fabricar las ambulancias tipo "Van", como es la Travois, que se ofrece al Municipio, “aun cuando les continuará dando mantenimiento”.
Véase el anuncio de Osage (Announcement), el cual se une a esta sentencia como Anejo III.
iv
En su comparecencia ante nos, el Municipio continúa en la dirección de racionalizar el proceso de la selección de la firma favorecida, y ahora pretenden ampliar en los fundamentos para denegar la buena pro al mejor postor por la alegada ausencia en el ofrecimiento del “Full Length” 8 Bar, “Sled Style” roll cage Protecting Patients and Drivers, y el "Grip Strut Rear Step w/Rubber Dock Bumpers".
*1158 Veamos todos los aditamentos de confort innecesarios, los cuales no fueron incluidos en los fundamentos originales, y ahora se pretende traerlos en apelación, los cuales ilustran la frivolidad de su defensa, y que aparecen a las páginas 5 a 7 de la "Moción de Desestimación", lo cual copiamos ad verbatim del Municipio.
Nos dice el Municipio ahora en apelación, que las ambulancias que ofrece Centrocamiones no tienen estas cosas, y nos dicen los alegados beneficios que brindan:

“A. ESPECIFICACIONES DEL CHASSIS 

1. Tilt Steering Wheel- Esto permite que el guía pueda subir y bajar dependiendo del CONDUCTOR que guie [sic] la ambulancia.. Es importante reconocer que los conductores tienen diferentes estaturas, peso, composición ósea, por lo que es importante contar con el Tilt Steering Wheel para seguridad y salud en el empleo de los conductores. ”

Las AMBULANCIAS del RECURRENTE NO cumplen con esta ESPECIFICIACION SEGUN la PROPUESTA sometida.
2. Cruise Control-Control de Velocidad Automática
TAMPOCO el Recurrente CUMPLE CON ESTA ESPECIFICACION.
3. Electric Windows and Door Locks-La Propuesta de Centrocamiones de Puerto Rico no incluyó que sus ambulancias tuvieran ventanas eléctricas ni seguro automático en las puertas. Estas fueron dos especificaciones que el Municipio de Juncos INCLUYO en el DOCUMENTO de ESPECIFICACIONES y la Parte RECURRENTE tenía conocimiento.
4. Deluxe Cloth High Back Captains Chair-Tampoco la ambulancia tipo II propuesta por el Recurrente cumplió con este requisito. La propuesta por el Recurrente es un asiento en VINIL y es el asiento ECONOMICO. Este asiento no tiene “ARMREST” o sea DESCANSADOR de BRAZOS, un elemento de salud y seguridad a los conductores de ambulancias.
B. ESPECIFICACIONES DEL AMBULANCE CONVERSION
1. Full Length 8-Bar “Sled Style” Roll Cage. El Municipio de Juncos requirió una caja protectora de techo compuesta de 8 barras para mayor protección y seguridad del PACIENTE, paramédicos y familiares. Más aún, viviendo en una sociedad donde los accidentes de automóviles son una de las causas principales de MORTANDAD en PUERTO RICO.
El Municipio le interesa ofrecer un servicio de calidad, salud y seguridad a los conductores de las ambulancias, a los paramédicos y a los pacientes. El Municipio desea evitar riesgos, daños y perjuicios por algo que pudo hacer y no hizo, por algo que debió haber previsto y no lo hizo. El Recurrente propuso una caja protectora de techo de 7 Barras. Las ambulancias Specialty Vehicles of P.R. tienen 8 barras de protección y seguridad. VÉASE ANEJO XV. Ilustración barra protectora.
2. CURB SIDE 6" IMPACT PROTECTION BEAM. Esto se refiere a una BARRA protectora ubicada a lo largo de la camilla del paciente, protegiendo al PACIENTE en caso de una colisión en esa área. VEASE ANEJO XV. Ilustración barra protectora. La Parte Recurrente NO CUMPLIO con esta especificación, Specialty Vehicles of P.R. cumplió.
Nos preguntamos ¿Por qué razón el Municipio de Juncos le convendría adquirir Dos Ambulancias que NO dan Protección, salud y seguridad en el empleo a los paramédicos ni salud, seguridad y protección a los *1159 pacientes al no tener la Curb Side 6” Impact Protection Beam ni el FULL LENGTH 8 BAR “SLED STYLE’ ROLL CAGE ni otros requisitos. ¿Qué utilidad económica representa para el Municipio el comprar ambulancias que no tienen una barra de protección al lado de la camilla del paciente, cuando la vida de un paciente está en riesgo desde el momento que es transportado en la ambulancia principal? Sena útil y conveniente? La seguridad del pueblo vale mucho más que Dos Mil ciento cinco dólares ($2,105.00) por unidad, diferencia en la oferta del segundo postor. Esta cantidad es un precio razonable a pagar por la protección, salud y seguridad en el empleo; salud y seguridad a los pacientes, y salud y seguridad al público en general.
También nos preguntamos si Specialty Vehicles of Puerto Rico pudo presentar una propuesta que cumplió con todas las especificaciones, ¿Por qué el Recurrente no hizo lo mismo? Las especificaciones son razonables. El Recurrente podía cumplir con las mismas y no lo hizo.
Aquí termina la exposición de la representación legal del Municipio.
A pesar de que no son determinantes, discutiremos la improcedencia de estas alegadas "deficiencias" en la página 14.
v
Los intentos del Municipio de Juncos de justificar su rechazo de la licitación del postor no solamente más bajo, sino que además entregaría las ambulancias en menos tiempo, no terminan con esta exposición, pues hay otros aditamentos que enumeran como no ofrecidos por Centrocamiones. El problema que tiene el Municipio es que sólo basó su rechazo de la licitación de Centrocamiones en dos premisas, la de las 5 barras protectoras, y la del bumper de atrás de la ambulancia.
La actuación de la Junta de Subasta del Municipio se puede deber a varios factores. Uno, a ignorancia de los miembros de la Junta del idioma Inglés, en cuyo caso debía la Junta utilizar un traductor, o exigir a los licitadores que se expresen en Español. Dos, podría deberse a que la Junta no utilizó un asesor en especificaciones de automóviles. Tres, podría deberse a que quería favorecer por los motivos que fueran a Specialty Vehicles.
Queremos pensar que se debió a una de las dos primeras razones y no a la tercera, pues estaríamos en un procedimiento ilegal, con serias consecuencias para el Municipio. Veamos porqué.
Primero, Centrocamiones sí ofreció las barras protectoras del techo en su licitación. Aparece a la página 21 del alegato de Centrocamiones, bajo el acápite 3, ROOF CONSTRUCTION, inciso D:

“FIBERGLASS ROOF SUPPORTED BY FULL ROLL CAGE CONSISTING OF SEVEN 1-1/4" STEEL TUBING RUNNING VERTICAL AND 3-1/4" FLAT STOCK STEEL RUNNING HORIZONTAL. ” 

El Municipio dice que sólo ofrecen 7 barras y ellos querían 8 barras. Ello no se explica a nuestro entender satisfactoriamente, pues la ambulancia que ofrece Centrocamiones tiene 7 barras en el plano vertical de 1 !4 pulgadas, y una (1) barra en el plano horizontal a todo lo largo de 3 !4 pulgadas. Consideramos que no tienen razón.
Segundo, Centrocamiones sí ofreció el bumper de atrás de la ambulancia. Aparece a la página 22 del alegato de Centrocamiones, bajo el acápite 7. REAR BUMPER STEP, e incluye:

“A. FULL WIDTH CONSTRUCTION STEEL GRATING, B. CAPABLE OF SUPPORTING 500 lb. TEST WEIGHT WITHOUT FLEXING, C. REAR DOCK BUMPERS.” 

*1160 Tercero, Centrocamiones sí ofreció el parachoques del lado de la camilla del paciente, que en las especificaciones conforme al lenguaje de Specialty Vehicles se llama, "CURB SIDE 6" IMPACT PROTECTION BEAM". Aparece el ofrecimiento en la página 21 del alegato de Centrocamiones en el acápite 4. SIDE WALL CONSTRUCTION, e incluye:
“CRASH RAILS WELDED TO EACH SIDE OF CHASSIS INTERIOR WALL USED TO SECURE SQUAD BENCH AND CABINETS ” 
vi
Veamos las otras cuatro (4) "deficiencies" en la licitación de Centrocamiones, que el Municipio señala en apelación, pero que omitió señalarlas cuando rechazó la oferta del mejor postor, y las ha añadido en apelación como relleno. Aunque estos señalamientos no pueden ser determinantes en esta etapa, vale la pena señalar que se trata de una ambulancia, no de un auto de turismo. Las ambulancias estarán en uso en este o cualquier Municipio durante 24 horas, los 365 días del año, para transportar seres en emergencia, no para paseos. El conductor de una ambulancia no va en un viaje de placer o paseo, sino en una gestión de trabajo. Mientras más aditamentos cosméticos se le instalen a la ambulancia, más posibilidades se crean de tiempo en el taller para que le arreglen equipos como el "tilt steering wheel", los "electric door and windows locks", y el "cruise control". El "Super Deluxe Captain Chair" lo dejamos para último.
Uno, el Tilt Steering Wheel, que es la rueda del guía que sube y baja. Dice el Municipio que ”[e]s importante reconocer que los conductores tienen diferentes estaturas, peso, composición ósea por lo que es importante contar con el Tilt Steering Wheel, para seguridad y salud en el empleo de los conductores".
No alcanzamos a apreciar cómo la salud y seguridad del conductor puede depender del sube y baja del guía, y no se nos explica por el Municipio.
Dos, el Cruise Control, o Control de Velocidad Automática. Tampoco se nos explica por el Municipio, ¿cómo, bajo las condiciones de las carreteras y la densidad actual del tráfico, puede un conductor de ambulancia en Puerto Rico viajar en piloto automático con un paciente en la ambulancia?
Tres, Electric Windows and Door Locks. Esto se refiere al cierre electrónico de ventanas y puertas. Tampoco se nos dice en qué forma esto va a mejorar el servicio de la ambulancia, y qué se hará cuando se dañe el motorcito de subir los cristales, en que con el cristal abajo no funciona bien el aire acondicionado, y lo que sucederá cuando se le agote la batería al "beeper" o control.
Cuatro, el asunto del "Deluxe Cloth High Back Captain Chair", nos resulta desmesurado. El Municipio pretende gastar la friolera de más de CUATRO MIL ($4,200.00) DOLARES en dos sillas del conductor, de TELA DE LUJO estilo DEL CAPITAN, como en las "De Luxe 4 x 4", para que los conductores tengan descanso de los brazos o "arm rests". ¿Y eso forma parte del interés público? No consideramos esto un gasto moderado, y ello atrasará la entrega de las ambulancias en un plazo de 30 a 45 días, ya que Specialty ofrece entregar las ambulancias en 60 a 90 días -si es que OSAGE las sigue fabricando-, pero Centrocamiones las ofrece en 30 a 45 días.
II. El Derecho.
En 17 de agosto de 2000, este Tribunal de Circuito de Apelaciones dispuso del caso de Punta Arenas Concrete v. Junta de Subastas del Municipio de Hormigueros, KLRA-00-00471, resolviendo que cuando se trataba de decisiones de una Junta de Subastas de un municipio, no tenía que cumplir con el requisito de informar a los lidiadores los fundamento s de su decisión.
*1161 Entendió este Tribunal entonces que, conforme al Art. 15.002 de la Ley de Municipios Autónomos, 21 L.P. R.A. § 4702, la notificación de adjudicación de una subasta debía advertir al.licitador de su derecho a procurar revisión judicial, del término disponible para hacerlo, y de la fecha de archivo en autos de copia de la. notificación de la adjudicación, pero no tenía que incluir los fundamentos en que se basó la Junta al adjudicar la subasta. El Tribunal Supremo revocó a este Tribunal en el caso Punta de Arenas Concrete, Inc. v. Junta de Subastas, Municipio de Hormigueros,_D.P.R._(2001), 2001 JTS 50, resuelto en 30 de marzo de 2001.
Indicó el Tribunal Supremo, entonces, que erró este Foro Apelativo por dos razones:
“En primer lugar, al concluir que la lista de requisitos del caso IM Winner es una enumeración taxativa, en numero cerrado.
En segundo lugar, que los requisitos establecidos en IM Winner y L.P.C.& D., Inc., no surgen exclusivamente de la L.P.A.U. ni de la Ley de Municipios Autónomos, respectivamente. Indicó que estos requisitos surgen del debido proceso de ley. Por tanto, estos requisitos son de rango Constitucional y aplican tanto a las subastas llevadas a cabo por municipios como a las subastas de las agencias. Sabido es que, "/7/a naturaleza del debido proceso de ley es una eminentemente circunstancial y pragmática." IM Winner, supra. Es por esto que en IM Winner explícitamente dijo el Tribunal Supremo que no pretendía "elaborar una enumeración taxativa de las exigencias del debido proceso de ley.” Id.

"En ese caso, inclusive, hicimos referencia a la exigencia de fundamentar la adjudicación de una subasta establecida en L.P.C.&D. Id. Por tanto, estaba implícito en IM Winner lo que ahora hacemos explícito, que esta exigencia es una que por ser requerida por el debido proceso de ley, es necesaria tanto en subastas celebradas bajo la L.P.A. U. como bajo la Ley de Municipios Autónomos.

El hecho de que el requisito de incluir los fundamentos lo exija el debido proceso de ley, surge claramente de la reciente jurisprudencia de este Tribunal. En L.P.C.&D., explicamos porqué es tan fundamental al debido proceso de ley este requisito: "Para que este Tribunal pueda cumplir con su obligación constitucional y asegurar que el derecho a obtener revisión judicial de una decisión de una agencia sea uno efectivo, es imprescindible exigir que la misma esté fundamentada, aunque sea deforma sumaria. Si la parte adversamente afectada por la determinación de una agencia desconoce los motivos de la agencia para su proceder, el trámite de revisión judicial de la determinación administrativa se convertiría en un ejercicio fútil. No basta con informar la disponibilidad y plazo para solicitar la reconsideración y la revisión." L.P.C.&D., supra, citando, RBR Construction v. Autoridad de Carreteras, res. el 22 de diciembre de 1999, 2000 J.T.S. 7.
Una vez la legislatura ha concedido el derecho a la revisión judicial, el debido proceso de ley requiere que esta revisión sea una efectiva. En Colón Torres v. A.A.A., 143 D.P.R. 119 (1997), expresó el Tribunal Supremo que: "[e]l derecho a presentar revisión judicial de las decisiones administrativas es provisto mediante estatuto, por lo que forma parte del debido proceso de ley. En consecuencia, la falta de una notificación adecuada podría afectar el derecho de una parte a cuestionar la determinación decretada por el organismo administrativo, enervando así las garantías del debido proceso de ley. Habiéndose otorgado el derecho a revisar judicialmente la adjudicación de una subasta, el debido proceso de ley exige una notificación adecuada para ejercer efectivamente tal derecho... no se podría cuestionar judicialmente lo que no se conoce." IM ■ Winner, suprá.
Al requerir que se incluyan los fundamentos en la notificación, nos aseguramos que los tribunales puedan revisar dichos fundamentos para determinar si la decisión fue una arbitraria, caprichosa o irrazonable. Este aspecto cobra especial importancia en el caso de subastas públicas, ya que envuelven directamente el desembolso de fondos públicos. L.P. C. & D., supra.
*1162 Esta norma “hace efectivo el ejercicio del derecho a solicitar revisión judicial de las adjudicaciones de subasta y nos posibilita a nosotros ejercer nuestra función revisora. ” L.P.C.&D., supra.
Además, como explicó el más Alto Foro en L.P.C.& D., el requerir que las notificaciones sean fundamentadas promueve otros objetivos importantes:
“(1) proporcionar a los tribunales la oportunidad de revisar adecuadamente la decisión administrativa y facilitar esa tarea; (2) fomentar que la agencia adopte una decisión cuidadosa y razonada dentro de los parámetros de su autoridad y discreción; (3) ayudar a la parte afectada a entender porqué el organismo administrativo decidió como lo hizo, y al estar mejor informada, poder decidir si acude al foro judicial o acata la determinación; (4) evitar que los tribunales se apropien de funciones que corresponden propiamente a las agencias administrativas bajo el concepto de especialización y destreza.” L.P.C.& D., supra; Rivera Santiago v. Secretario de Hacienda, 119 D.P.R. 649 (1950).
En el caso que ahora consideramos, estos objetivos y este razonamiento aplican con igual fuerza, ya que la Ley de Municipios Autónomos provee para la revisión judicial de las subastas llevadas a cabo por los municipios. 21 L.P.R.A. § 4702(2). Además, este requisito de una notificación fundamentada es de especial importancia en el caso de los municipios dada la gran cantidad de subastas que celebran los mismos y la gran cantidad de fondos públicos que se desémbolsan como consecuencia. De no existir esta norma, el tribunal se vería en la necesidad de celebrar un juicio de novo cada vez que fuera a revisar las actuaciones de las agencias y los municipios. Esto sería sumamente ineficiente y promovería el que dichos organismos fundamentaran sus actuaciones a posteriori, como ha pretendido el Municipio de Juncos en su comparecencia ante nos, señalando fundamentos adicionales a los que la Junta esgrimió para rechazar al mejor postor en la subasta, Centrocamiones.
Finalmente señalamos lo dicho por el Tribunal Supremo en el caso de Henríquez v. Consejo de Educación Superior:
“En el pasado, ante diversas situaciones, hemos expresado el principio de que el debido proceso de ley ofrece protección contra la arbitrariedad administrativa, pero en modo alguno es "molde rígido que prive de flexibilidad" a los organismos administrativos. ” Rodríguez v. Tribunal Superior, 104 D.P.R. 335 , 340 (1975); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987). En otras ocasiones, hemos manifestado que el debido proceso no tiene en el campo del derecho administrativo la rigidez que se le reconoce en la esfera penal. Atiles, Admor. v. Comisión Industrial, 63 D.P.R. 62, 63 (1944); A.D.C.V.P. v. Tribunal Superior, 101 D.P.R.875, 882 (1974). Sin embargo, siempre hemos reconocido, dentro de este marco general, que el debido proceso requiere "un proceso justo y equitativo que respete la dignidad de los individuos afectados". Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 (1987).

De todos los valores que informan la garantía del debido proceso, el valor de la percepción de la justicia es el que con mayor claridad dicta el uso de un adjudicador imparcial con criterios independientes. Véase Schweiker v. McClure, 456 U.S. 188, 195 (1982). Redish-Marshall, Adjudicatory Independence and The Values of Procedural Due Process, 95 Yale L.J. 455 (1986). La necesidad de imparcialidad adjudicativa en la infraestructura del debido proceso impide al adjudicador decidir un caso si tiene interés o prejuicio real identificable o cuando las circunstancias son tales que el riesgo de parcialidad es demasiado grande. Withrow v. Larkin, 421 U.S. 35, 47 (1975). ’’

Por los fundamentos que informan nuestra determinación, se dicta Sentencia para revocar la adjudicación de la Junta de Subastas del Municipio de Juncos, en la Subasta Numero 33, "Para la Adquisición de Dos Ambulancias Equipadas Tipo II", notificada en 6 de septiembre de 2001, y se ORDENA que se emita por la Junta un dictamen otorgando la buena pro al mejor postor en dicha subasta, Centrocamiones de Puerto Rico, *1163 Inc.
La Juez Pesante Martínez concurre con el resultado, sin escrito.
NOTDFIQUESE por la vía ordinaria inmediatamente.
Lo acordó el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002DTA76
1. Salvo que otra cosa señalemos, usaremos "Apéndice" para referirnos al sometido con la Solicitud de Revisión por Centrocamiones.
2. La palabra correcta es Sled, de trineo.
3. La palabra correcta es Patients, de pacientes.
4. La palabra correcta es Strut, o parrilla de apoyo.
5. La del anuncia de subasta y es la que ofrece Specialty Vehicles.
6. Especificaciones que no tiene que ver nada con el CHASSIS.
7. Techo de fiberglass sostenido por una jaula de rodaje que consiste de siete tubos de acero de 1 y media pulgada que corren en el plano vertical y una plancha de acero de tres y un cuarto de pulgada que corre en el plano horizontal.
8. Ofrecen un escalón de parrilla a todo lo ancho de atrás, capaz de soportar 500 lbs. sin doblarse, y bumpers traseros que usualmente son de goma.
9. Rieles de impacto lateral en cada lado de la pared interior del chasis utilizada para asegurar el banco de los asistentes y los gabinetes.
10. IM Winner Inc., v. Junta de Subastas del Gobierno Municipal de Guayanilla,_D.P.R._(2000), 2000 JTS 86.
11. L.P.C.&D., Inc., v. Autoridad de Carreteras,_D.P.R._(1999), 2000 JTS 9.